**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 23 2001**

**PATRICK FISHER**
**Clerk**

UNITED STATES COURT OF APPEALS

TENRICK FISHER TENTH CIRCUIT

K. DANIEL RUPP,

 Plaintiff - Appellant,

 v.

DAVID J. PHILLIPS, in his personal
capacity,

 Defendant - Appellee.

No. 99-3355

(D. Kansas)

(D.C. No. CIV-99-2101-WEA)

---

**ORDER AND JUDGMENT** *

---

Before **HENRY** and **MURPHY**, Circuit Judges, and **MILLS**, District Judge. **

---

Daniel Rupp is a former employee of David Phillips, the Federal Public

Defender ("FPD") in Wichita, Kansas. Mr. Rupp brought this <u>Bivens</u> action

against Mr. Phillips, arguing that when Mr. Phillips terminated Mr. Rupp's

employment at the Wichita FPD office, he violated Mr. Rupp's First Amendment

---

 * This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

 ** The Honorable Richard Mills, United States District Judge for the
Central District of Illinois, sitting by designation.

rights.  The district court granted summary judgment to Mr. Phillips.  We have jurisdiction pursuant to 28 U.S.C. § 1291 and affirm the judgment of the district court.

## I.  BACKGROUND

The Federal Public Defender represents indigent defendants in the federal courts.  As FPD for the District of Kansas, Mr. Phillips supervises an office that employs individuals with several types of skills (for example, investigators and legal counsel), and handles a variety of federal cases ranging from parole violations to capital crimes.  In December of 1994, Mr. Rupp was hired by the FPD's Wichita office as an investigator.

Mr. Rupp is an avid gun collector and frequently visits gun shows. Sometime during 1997, Mr. Rupp met a vendor named Timothy Tobiason at one of these shows.  Mr. Tobiason was selling books that described how to manufacture biological and chemical weapons of mass destruction.  After conversing with Mr. Tobiason, Mr. Rupp learned that Mr. Tobiason "was very disgruntled with regard to how he had been treated by the government in business and in his personal life."  Aplt's App. at 433.

On June 6, 1998, Mr. Rupp attended another weekend gun show, where he again encountered Mr. Tobiason.  Mr. Tobiason was now selling a book entitled

"Advanced Biological Weapons Design and Manufacture," which contained instructions on how to culture and spread deadly diseases, as well as language threatening the government. Id. at 432-36. Mr. Rupp talked with Mr. Tobiason, and became convinced that not only had Mr. Tobiason actually begun to manufacture chemical weapons, but that he had plans to use them against agents of the government. According to Mr. Rupp, Mr. Tobiason stated that the damage caused by "the Oklahoma City bombing would be nothing" compared to what he was prepared to do. Id. at 437-38.

Mr. Rupp feared that the commission of these crimes was imminent, so on the next business day (June 8, 1998), he contacted federal law enforcement agents to report Mr. Tobiason. Mr. Rupp described Mr. Tobiason's activities and threats to Paul Vick, an FBI agent. Mr. Rupp and Agent Vick then discussed the possibility of Rupp being "a cooperating witness," in which case Mr. Rupp might "volunteer to be wired" to record future conversations with Mr. Tobiason. Id. at 237.

Mr. Rupp then contacted Mr. Phillips, and told him about his encounter with Mr. Tobiason and his conversation with Agent Vick. According to Mr. Phillips, he commended Mr. Rupp for telling the FBI about Mr. Tobiason, but said Mr. Rupp should not be involved in any FBI investigation, and asked Mr. Rupp to contact Cindy McNorton, Mr. Rupp's supervisor. After Mr. Rupp told

Ms. McNorton that he might "wear a wire" to tape Mr. Tobiason at an upcoming gun show, Ms. McNorton reported this to Mr. Phillips. Id. at 208. Mr. Phillips instructed Ms. McNorton to tell Mr. Rupp that because of conflicts of interest between the FPD and FBI, "we can't have him working undercover for the FBI." Id. at 209. Ms. McNorton stated that Mr. Rupp then told her that "he would not sneak around her." Id. at 311.

Mr. Rupp subsequently went back to Agent Vick to ask what the FBI would want from him. According to Mr. Rupp, Agent Vick stated that it would be illegal for the FPD to terminate him for cooperating with the FBI. Mr. Rupp then asked Ms. McNorton what he could do for the FBI. According to Mr. Rupp, Ms. McNorton told him he could not be a witness. However, Mr. Phillips claims Ms. McNorton's response was much stronger; in his account, she told Mr. Rupp that he was "out" of the Mr. Tobiason investigation, that "there was nothing more that he could do on that case," and that even if he was contacted again by Mr. Tobiason, he should discuss the situation with the FPD before resuming contact with the FBI. Id. at 213.

Throughout that summer, without informing his employer, Mr. Rupp continued to keep in touch with Agent Vick. At Agent Vick's request, on June 16, 1998, he wrote a letter to Mr. Tobiason, inquiring whether he would be at a Wichita gun show in September. Near the end of that month, Mr. Rupp received a

response from Mr. Tobiason, indicating that Mr. Tobiason would be at that September show. Mr. Rupp turned that letter over to Agent Vick, who asked him to attend the show and assess Mr. Tobiason's "state of mind." Id. at 119.

In September, Mr. Rupp mentioned to an FPD co-worker that he would be attending the upcoming gun show in order to "do a favor for the FBI." Id. at 439. The co-worker suggested that Mr. Rupp contact Ms. McNorton and tell her about this plan. Mr. Rupp did so on Sept. 10. Ms. McNorton then conferred with Mr. Phillips and Charles Dedmon, an FPD attorney from Topeka. According to Mr. Phillips, the three of them decided the FPD could no longer trust Mr. Rupp, as he had in their view chosen to be involved in the investigation after he had been instructed not to be, and after he said he would not be. They also decided that his actions "disrupted" the operation of the FPD office. Id. at 335. As a result, Mr. Phillips terminated Mr. Rupp's employment. The parties agree that following his termination, Mr. Rupp subsequently exhausted all the administrative remedies that were available to him, but was unable to regain his job. He then filed this suit against Mr. Phillips.

The district court granted summary judgment in favor of Mr. Phillips. It assumed for the sake of the summary judgment motion that a Bivens action could be maintained against Mr. Phillips, and then considered the question of whether Mr. Phillips had violated Mr. Rupp's First Amendment rights. Citing Cragg v.

<u>City of Osawatomie, Kan.</u>, 143 F.3d 1343 (10th Cir. 1998), the court stated that that question was governed by the four part test set forth in <u>Pickering v. Board of Educ.</u>, 391 U.S. 563 (1968), and <u>Connick v. Myers</u>, 461 U.S. 138 (1983) (the "<u>Pickering</u> /<u>Connick</u> balancing test").

The court found that Mr. Rupp's initial contact with the FBI, in which he reported his concerns regarding Mr. Tobiason, "clearly [involved] matters of public concern and an expression of free speech." Aplt's App. at 530 (Dist. Ct. Order, dated Oct. 19, 1999). However, it continued, Mr. Rupp

> was not reprimanded or terminated for this initial contact. Rather, he was praised for his efforts, but advised that he could no longer continue assisting the FBI in its investigation and work with the FPD's office due to potential conflicts of interest, office disruption, and loss of credibility.

<u>Id.</u> at 530-31. The court stated that Mr. Rupp "agreed to cease his involvement," but in spite of this agreement, "continued to assist the FBI." <u>Id.</u> at 531.

The court then found that Mr. Rupp's continued involvement in the investigation was "unnecessary for the investigation" and thus "not, in this Court's opinion, an expression of free speech protected by the First Amendment." <u>Id.</u> In the alternative, even if Mr. Rupp's involvement had been an activity protected by the First Amendment, the court found that "the FPD's interest in restricting [Mr. Rupp's] expression outweighs his constitutional rights." <u>Id.</u> at 532. Applying the <u>Pickering</u> /<u>Connick</u> balancing test, it found that Mr. Phillips

had advanced "substantial evidence of disruption," and shown that his decision to terminate Mr. Rupp "was not based on mere speculation, but on evidentiary support including his personal opinion and loss of trust, the opinion of [Mr. Rupp's] immediate supervisor, and an attorney within the office."    Id. at 535-36.

The court concluded that Mr. Rupp's actions "disobeying specific instructions" and "concealing his involvement until he knew his assistance would be discovered," as well as "the nature of his position within the FPD and the knowledge of Mr. Mr. Tobiason concerning [Mr. Rupp's] employment, render [Mr. Phillips's] interest much greater than those of [Mr. Rupp] in continuing his role in the investigation."    Id. at 537.  It also ruled that even if Mr. Phillips had committed a constitutional violation, he enjoyed qualified immunity for his actions.

## II.  DISCUSSION

We review de novo the district court's grant of summary judgment, viewing the record in the light most favorable to Mr. Rupp, as the party opposing summary judgment.  See McKnight v. Kimberly Clark Corp.    , 149 F.3d 1125, 1128 (10th Cir. 1998).  "In cases involving the First Amendment, the de novo standard is appropriate . . . for the further reason that . . . an appellate court has an obligation to make an independent examination of the whole record in order to make sure

that the judgment does not constitute a forbidden intrusion on the field of free expression." Horstkoetter v. Dep't of Public Safety, 159 F.3d 1265, 1270 (10th Cir. 1998) (internal quotation marks omitted). Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Fed.R.Civ.P. 56(c).

On appeal, Mr. Rupp asserts three errors by the district court. First, he argues that the court was incorrect when it found that his continued contact with the FBI did not pertain to a matter of public concern, and thus was not protected by the First Amendment. Second, he argues that the district court's balancing of the parties' interests was mistaken, and that any disruption of FPD activities was outweighed by Mr. Rupp's First Amendment interests in cooperating with the FBI. Finally, Mr. Rupp contends that because Mr. Phillips' conduct violated clearly established law, the court should not have found Mr. Phillips qualifiedly immune from suit. We consider these arguments in turn.

## A.  Speech on a Matter of Public Concern

When acting as an employer, the government may constitutionally restrict the speech of its employees to a greater degree than when it acts in its general capacity as the sovereign. The Supreme Court has explained that:

> Government agencies are charged by law with doing particular tasks. Agencies hire employees to help do those tasks as effectively and efficiently as possible. When [an employee] . . . begins to do or say things that detract from the agency's effective operation, the government employer must have some power to restrain [him].

Waters v. Churchill, 511 U.S. 661, 674-75 (1994). However, this power to restrain government employees' First Amendment rights is not absolute. To determine whether Mr. Phillips's actions have infringed upon Mr. Rupp's freedom of speech and expression, we apply the Pickering /Connick test. See Jantzen v. Hawkins, 188 F.3d 1247, 1257 (10th Cir. 1999).

The test is as follows: (1) Does the speech in question involve a matter of public concern? If so, (2) we must weigh the employee's interest in the expression against the government employer's interest in regulating the speech of its employees so that it can carry on an efficient and effective workplace. These first two parts of the test are questions of law. If the employee prevails on both these questions, we proceed to the remaining two steps, which are questions of fact. In part (3), the employee must show the speech was a substantial factor driving the challenged governmental action. If the employee succeeds, (4) the employer, in order to prevail, must in turn show that it would have taken the same action against the employee even in the absence of the protected speech. Id.; see also Horstkoetter, 159 F.3d at 1271.

-9-

In the first part of the test, we must inquire whether Mr. Rupp's actions constituted speech involving a matter of public concern. We have held that "[m]atters of public concern are those of interest to the community, whether for social, political, or other reasons." Lytle v. City of Haysville, Kan., 138 F.3d 857, 863 (10th Cir. 1998) (citing Connick, 461 U.S. at 145-49). It is absolutely clear, as both parties agree, that Mr. Rupp's initial contact with the FBI was speech that involved a matter of public concern, and was protected by the First Amendment. The district court correctly found in favor of Mr. Rupp on this issue. Aplt's App. at 530.

However, the district court also found that Mr. Rupp's subsequent involvement with the FBI was outside the protection of the First Amendment. Citing Curtis v. Oklahoma City Pub. Schools Bd. of Educ., 147 F.3d 1200, 1212 (10th Cir. 1998), Mr. Rupp challenges this finding. In Curtis, we noted that "'[i]n deciding how to classify particular speech, courts focus on the motive of the speaker and attempt to determine whether the speech was calculated to redress personal grievances or whether it had a broader public purpose.'" Id. (quoting Gardetto v. Mason, 100 F.3d 803, 812 (10th Cir. 1996)). Mr. Rupp argues that his continued cooperation with the FBI "was clearly a matter of grave public concern," due to the seriousness of the crimes threatened by Mr. Tobiason, and was not motivated by personal grievances. Aplt's Br. at 29. Mr. Rupp contends

-10-

that at the time Agent Vick asked him to write a letter to Mr. Tobiason, he understood Agent Vick to have implied that Mr. Rupp's continued involvement was necessary to the investigation. Id. at 30. This, Mr. Rupp proposes, demonstrates both that the FBI deemed the investigation to be a matter of public concern, and that he was not acting for merely personal reasons.

In contrast, Mr. Phillips urges that although Mr. Rupp's initial contact with the FBI may be called speech, his further cooperation may not, because he was neither "expressing his views" nor "commenting upon a matter of public concern." Aple's Br. at 22. In support of this contention, Mr. Phillips cites Koch v. City of Hutchinson, 847 F.2d 1436, 1447 (10th Cir. 1988), for the proposition that Mr. Rupp's cooperation was not speech relating to a matter of public concern because it was not intended to inform the public at large. In essence, Mr. Phillips would have us hold that, although initially informing a law enforcement agency about a possible crime may be protected speech, subsequent cooperation with the agency is not necessarily protected.

Mr. Rupp's conduct does not readily compare to that of employees in our previous Pickering/Connick cases. Where we have held that speech did not involve a matter of public concern, that speech has essentially involved matters that were not of general public interest because they related only to the internal operations of an employee's workplace. See, e.g., Koch, 847 F.2d at 1447-49

-11-

(fire investigation report was routine work product that was not intended to inform public); see also Connick, 461 U.S. at 146-47 (holding that employee speech "upon matters only of personal interest" is unprotected). Mr. Rupp's continued cooperation with the FBI cannot be characterized as having only been related to personal grievances or the routine internal operations of the FPD. But where we have held that employees' speech did involve a matter of public concern, employees generally spoke in order to inform the public about some matter of public interest involving the workplace. See, e.g., Curtis, 147 F.3d at 1206, 1211-12 (public school employee, whose job was to help public schools achieve "equity," spoke on matter of public concern in discussing whether school district was meeting that goal); Gardetto, 100 F.3d at 812-13 (speech of public college employee discussing matters including questionable academic credentials of college president involved public concern). Mr. Rupp's continued cooperation with the FBI did not reveal anything to the public about the FPD. [1]

However, as the district court correctly noted, any ambiguity as to the status of Mr. Rupp's actions under the first part of the Pickering/Connick test is of limited significance, because there is no uncertainty regarding the legal resolution of the second part of that test. As such, we will now turn to that

---

[1] There is also some question as to whether Mr. Rupp's later actions may be characterized as "speech." See Horstkoetter, 159 F.3d at 1272 n.3.

second part.   See Horstkoetter , 159 F.3d at 1272-73 (holding that "even assuming [a plaintiff] can survive the first hurdle," he must also overcome the second before he can prevail).

## B. Balancing the interests of Mr. Rupp and the FPD

With regard to the second part of the      Pickering /Connick  test, the district court found that the interests of the FPD in regulating Mr. Rupp's speech outweighed Mr. Rupp's interest in that speech.  Aplt's App. at 530          . Mr. Rupp challenges this finding on several grounds.  He states that his speech was a matter of serious, weighty public concern; that as a consequence, Mr. Phillips should be required to make a "stronger showing" of the necessity of a speech restriction; and that Mr. Phillips has failed to make this showing, as Mr. Rupp's speech "caused no actual disruption to client services at the public defender's office." Aplt's Br. at 37, 39.

In order to establish the seriousness of the public concern with his speech, Mr. Rupp essentially equates the object of his speech with the object of the FBI investigation.  He states that "[i]t is hard to imagine a more substantial public concern than the one in this case," namely that of saving the lives potentially threatened by Mr. Tobiason, and that his speech "should be entitled to greater weight because he was acting at the request of the FBI trying to save lives."

-13-

Aplt's Br. at 37-38. Additionally, if his speech involved matters of public concern, Mr. Rupp argues that under Cragg v. City of Osawatomie, Kan., 143 F.3d 1343 (10th Cir. 1998), we should require Mr. Phillips to make a "stronger showing" of the necessity of infringing upon Mr. Rupp's speech rights. Id. at 1346 (quoting Connick, 461 U.S. at 152).

Mr. Rupp also contends that his employer's interests were not sufficiently weighty to justify his termination. Citing testimony by Mr. Phillips and Ms. McNorton, he argues that his cooperation with the FBI caused no real disruption in the FPD's office. For instance, at one point in Ms. McNorton's deposition, she stated that "[a]ny actual disruption that I can think of was pretty minor." Aplt's App. at 224; see also Aplt's App. at 257-67 (deposition testimony of Mr. Phillips). In light of this testimony, Mr. Rupp argues that under Wulf v. City of Wichita, 883 F.2d 842 (10th Cir. 1989), Mr. Phillips's concerns were "purely speculative," and thus insufficient to outweigh Mr. Rupp's interest in his speech. Id. at 862 (internal quotation marks omitted).

In response, Mr. Phillips proposes that not only was the FPD not required "to wait for speech actually to disrupt core operations before taking action," but that contrary to Mr. Rupp's statements, it had shown actual disruption. Aple's Br. at 26 (quoting Moore v. City of Wynnewood, 57 F.3d 924, 934 (10th Cir. 1995)). For example, Mr. Phillips cites the deposition of Charles Dedmon, who stated that

-14-

the FPD's office could not trust Mr. Rupp to perform his job function as a result of his contacts with the FBI; apparently, during the time Mr. Rupp was interacting with the Wichita FBI office regarding Mr. Tobiason, the Wichita FBI office and the Wichita FPD office were working on opposite sides of a capital case. Aplt's App. at 335; see also Aplt's App. at 293-94 (deposition of Cyd Gilman).

Mr. Phillips further contends that Mr. Rupp was not terminated merely for speaking with the FBI, but for continuing to cooperate with the FBI after he had indicated to the FPD that he would not do so. In Mr. Phillips's view, this increases the weight we should give to the FPD's interest in regulating Mr. Rupp's speech. He also argues that Mr. Rupp's continued FBI cooperation was not weighty, i.e. that it was of limited public importance, because the FBI was capable of carrying on the investigation without him.

After reviewing the record, we hold that under the Pickering/Connick balancing test, the interests of the FPD outweigh those of Mr. Rupp. We cannot agree that Mr. Rupp's continued cooperation with the FBI should be characterized as involving the most substantial of public concerns. Although the ultimate object of the FBI's investigation was important, the Pickering test asks us to balance not the general public concern with criminal investigations, but the specific public concern with Mr. Rupp's continued participation in this particular investigation.

-15-

The FBI's investigation of Mr. Tobiason had nothing to do with Mr. Phillips, or with wrongdoing at the FPD. While it is true that in Moore, we held that "[w]histleblowing, of course, is not the only form of public employee speech that is protected," we added that the government's relative burden "in justifying a particular discharge varies depending upon the nature of the employee's expression." Moore, 57 F.3d at 933 (quoting Connick, 461 U.S. at 150) (internal quotation marks omitted). In Moore, the discharged employee "did not reveal any new information to the public about the operation of the police department" that employed him. Id. We therefore held that the employee's speech was "less important and less valuable to the public than is the speech often at issue in public employee speech cases." Id; cf. Cragg, 143 F.3d 1343, 1346-47 (10th Cir. 1998) (participation in public political discourse "at the core" of speech protected by the First Amendment).

We conclude that, as with the speech at issue in Moore, Mr. Rupp's continued cooperation with the FBI did not implicate the same level of public concern as the speech of employees who expose official wrongdoing, or who participate in protected political activity. Mr. Rupp's initial contact with the FBI did reveal new information to the public, and so may have been entitled to greater weight under the balancing test. But once Mr. Rupp had tipped the FBI, it was certainly capable of carrying out an investigation of Mr. Tobiason with or without

-16-

Mr. Rupp's help.  Indeed, Agent Vick testified to this fact.        See Aplt's App. at 247.  Thus, even if we consider Mr. Rupp's continued speech to the FBI to be the equivalent of speaking to the public at large, it cannot be deemed either as new or as irreplaceable as the most protected types of speech.  For the purpose of Pickering /Connick  balancing, Mr. Rupp's choice to continue his undercover role in the Mr. Tobiason investigation did not imbue his speech with the utmost constitutional protection.  As a result, Mr. Phillips's burden is correspondingly less weighty.

Objecting to this potential conclusion, Mr. Rupp cites        Robinson v. Balog  , 160 F.3d 183 (4th Cir. 1998), for the proposition that there will be "serious implications" if we hold that public employees may be fired "for assisting a . . . criminal investigation."     Id. at 188.  But the facts of that case are distinguishable. In Balog , the plaintiffs' speech sought "to bring to light 'actual or potential wrongdoing or breach of public trust' on the part of government employees."        Id. (quoting  Connick , 461 U.S. at 148).  The employees who perpetrated the wrongdoing were the plaintiffs' supervisors, and the supervisors disciplined the plaintiffs for trying to correct the wrongdoing.  Because this was not Mr. Rupp's

situation, a holding that his interests were of less than maximal weight in no way calls into question the interests of employees in a case such as Balog.[2]

We also hold that Mr. Phillips's interests in regulating Mr. Rupp's speech were substantial, and outweighed Mr. Rupp's interest in his speech. As noted above, contrary to Mr. Rupp's assertion, Mr. Phillips has introduced evidence that Mr. Rupp's behavior created a disruption in the FPD office and disturbed its ability to carry out its mission. See Aplt's App. at 293-94, 335. This is consistent with the Supreme Court's rule that an employer's decision should be based on a reasonable interpretation of the evidence available to it. See Waters, 511 U.S. at 676-77. Moreover, we agree with Mr. Phillips that an agency such as the FPD, which in a sense works against law enforcement agencies when it works on behalf of its clients, may legitimately have heightened concerns about its employees' involvement with law enforcement. See Rankin v. McPherson, 483 U.S. 378, 390 (1987) ("The burden of caution employees bear with respect to the

---

[2] Mr. Rupp also contends that this holding will send "absolutely the wrong signal" to individuals contemplating future cooperation with the FBI, and possibly endanger lives. Aplt's Br. at 49. We emphasize again that nothing in today's decision discourages, much less prohibits, Mr. Rupp's original contact with the FBI. As such, it is unlikely to cause significant avoidance and error costs. In addition, if there had been some indication that Mr. Rupp's continued assistance with the investigation was imperative, our balancing assessment could well be different.

-18-

words they speak will vary with the extent of authority and public accountability the employee's role entails.").

Finally, Mr. Rupp's own statements reveal that he deliberately ignored the instructions of his supervisors. In his deposition, Mr. Rupp stated that although he had been told he would be fired if he continued to cooperate with the FBI, he did so anyway, because "knew" it "just had to be" illegal for the FPD to fire him on this basis. Mr. Rupp did not consult an attorney to verify this opinion. Aplt's App. at 114-15.

As we stated in Moore, "although government employers do not have a blanket license to retaliate against employees based on unfounded fears or speculation about the harmful effects of employee speech," Mr. Phillips has gone beyond speculation and has "identified a reasonable basis" for his actions. Moore, 57 F.3d at 935. The disturbance caused by Mr. Rupp's actions might have been outweighed if his speech had been of the utmost First Amendment importance. However, because it was not, we hold that the second part of the Pickering/Connick test clearly tips in favor of Mr. Phillips. As a result, we need not reach additional issues under that test.

## C. Mr. Phillips's Immunity

Mr. Rupp also argues that the district court was incorrect in finding that Mr. Phillips enjoyed qualified immunity with respect to the termination. Because we have held that there was no constitutional violation, we have no reason to consider this issue. See Moore, 57 F.3d at 935-36 (concluding that, where the plaintiff failed to demonstrate that the defendant violated his First Amendment rights, the court need not reach the issue of qualified immunity).

## III. CONCLUSION

For the reasons set forth above, we AFFIRM the judgment of the district court.

Entered for the Court,

Robert H. Henry
Circuit Judge