**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**April 16, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

DEBORAH S. MEYER,

      Plaintiff - Appellant,

v.

THE BOARD OF COUNTY
COMMISSIONERS OF HARPER
COUNTY, OKLAHOMA; SHAWN
STODDARD, individually and in his
official capacity as a deputy sheriff for
Harper County, Oklahoma; JOSH
SNIDER, individually and in his official
capacity as a deputy sheriff for Harper
County, Oklahoma; TOMMY PAINTER,
individually and in his official capacity as
a deputy sheriff for Harper County,
Oklahoma; MARK ERWIN, individually;
BETH SNELL, individually,

      Defendants - Appellees.

No. 04-6106

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D.C. No. CIV-02-1691-F)**

---

Phyllis L. Walta, Walta & Walta, Hennessey, Oklahoma, (Harold W. Jordan, Moore,
Oklahoma, with her on the briefs) for Plaintiff - Appellant.

Jodi S. Casey, Collins, Zorn & Wagner, P.C., Oklahoma City, Oklahoma, and Maurice G.
Woods, II, McAtee & Woods, Oklahoma City, Oklahoma, (Jerome S. Sepkowitz,
Derryberrry, Quigley, Solomon & Naifeh, P.A., Oklahoma City, Oklahoma, and Jason C.
Wagner, Collins, Zorn & Wagner, P.C., with them on the briefs) for Defendants-
Appellees.

Before **KELLY, HOLLOWAY** and **McCONNELL**, Circuit Judges.

**HOLLOWAY**, Circuit Judge.

I

*Introduction*

Plaintiff/appellant Deborah Meyer was involuntarily committed over a weekend to Oklahoma's Western State Psychiatric Center, an in-patient facility for treatment of the mentally ill and a part of the Oklahoma Department of Mental Health. Ms. Meyer brought an action under 42 U.S.C. § 1983, with pendent state law claims, against various officials and two private citizens who were involved in the affair. Defendants/appellees are the Board of County Commissioners of Harper County, Oklahoma; Shawn Stoddard, individually and in his official capacity as a deputy sheriff for Harper County, Oklahoma; Josh Snider, individually and in his official capacity as a deputy sheriff for Harper County, Oklahoma; Tommy Painter, individually and in his official capacity as a deputy sheriff for Harper County, Oklahoma; Mark Erwin, individually; and Beth Snell, individually.[1]

---

[1]The brief of plaintiff/appellant informs us that several parties were dismissed as a result of settlement efforts on appeal: Crystal Stoddard, the Town of Buffalo, and Buffalo police officer Steve Wheaton. No mention is made in the briefs of the disposition of the claims against defendants Erwin and Snell, but it appears they are proper appellees because of plaintiff's effort to reinstate her state law claims, as discussed *infra*. At oral

(continued...)

The district judge granted summary judgment on qualified immunity grounds in favor of all defendants (except that on plaintiff's Fourteenth Amendment claims the district court did not reach the qualified immunity issue, see n.4, *infra*), and plaintiff brings this appeal. The court also dismissed without prejudice all state law claims after deciding the federal claims.

## II

### *Factual Background*

This summary is largely taken from the district court's opinion, I Aplt. App. 251-266, but we have made some additions from the materials that were submitted to the district court in connection with the various motions for summary judgment and responses in opposition to those motions. Of course all facts are stated in the light most favorable to plaintiff as the party opposing summary judgment.

Plaintiff had been in a romantic relationship with defendant Mark Erwin, an employee of the Town of Buffalo, for a few months when they broke up, less than amicably, sometime in the spring of 2001. During their relationship, Erwin told Meyer that he was a "ten man" in the Ku Klux Klan, which he told her meant that he was an "enforcer" in the organization. III Aplt. App. 839-40. Erwin was frequently angry with Meyer. He also began expressing anger toward his sister, defendant Beth Snell, and made

---

[1](...continued)
argument plaintiff's attorney stated that the judgment in favor of the County (*i.e.*, the Board of County Commissioners) was not part of her appeal. We accept this concession and will affirm the district court's grant of summary judgment in favor of the County.

threats against her. *Id.* at 840-42.

Plaintiff testified that the defendant law enforcement officers – Stoddard, Painter, Snider and Wheaton – were personal friends of Mark Erwin. In an affidavit, plaintiff Meyer said that, during the time she had been dating Erwin, she often saw the four other men coming to Erwin's camper to socialize with him.

On the evening of May 17 (or perhaps the early hours of May 18), plaintiff went outside her rural home to investigate a noise she had heard. She said that she was "sucker punched" in the face with great force and knocked to the ground. She alleges that her assailant was Erwin, but it is not clear when she first identified him as her attacker. She did not report the attack that night.

The next night, actually in the early morning hours of Saturday, May 19, plaintiff called the county dispatcher to report trespassers on her property. When Harper County Deputy Sheriff Snider arrived, plaintiff also tried to report the attack from the previous night. Deputy Snider told her she would have to go to town to report that crime.

On the evening of May 19, plaintiff went to Buffalo, the county seat, to make the report. On the way, she saw Erwin at a convenience store and stopped to confront him. She told him to stay away from her. She then went to the county sheriff's office to make an assault report to the dispatcher, who served both the city and the county. The dispatcher told plaintiff that they "didn't do that" there.

Plaintiff Meyer then went to the home of the city police chief and told him that the

sheriff's office wouldn't take her report. Even though Ms. Meyer's home, where the attack occurred, was some 18 miles out of town, and so not in the jurisdiction of the Town of Buffalo, the police chief told her to go to the police station, and he had an officer, defendant Wheaton, meet her there. Wheaton photographed her bruises and said that he would consult with the sheriff's office.

After leaving the police station, plaintiff went to confront Erwin again. She knew that his family was having a graduation party for Erwin's niece at the office of Wheatland Commodities, a business owned by Erwin's sister, defendant Beth Snell. At this office plaintiff confronted Erwin in the presence of Snell and her husband. She showed her bruises and asked Erwin if he wanted to "finish what he's started." Plaintiff told Ms. Snell that Erwin was an "enforcer" with the KKK and that he was planning to murder her, Snell. Snell told plaintiff that she was crazy and ordered her to leave. Plaintiff refused and defendant Snell called the sheriff's office to report that plaintiff was "crazy" and refusing to leave. Plaintiff says that she never became violent and never threatened violence during this verbal confrontation. I Aplt. App. 83-86; II Aplt. App. 426. Testifying in another proceeding, Beth Snell said that there had been no violence and no threats; she also testified that all of the family members present at the Wheatland Commodities office when the defendant officers arrived had told them that plaintiff had not threatened them. *Id.* at 453-54 On appeal, defendants do not contend that plaintiff became violent or threatened violence during this incident.

Officer Wheaton and Sheriff's Deputies Stoddard, Snider and Painter came to the scene. Plaintiff was asked to wait in her vehicle. She got in her vehicle willingly and stayed there calmly while the officers interviewed Erwin and the Snells. *Id*. at 425, 427; III Aplt. App. 810. None of the officers attempted to take any sort of statement from plaintiff or to ask her any questions. It was decided that an emergency order of detention for psychiatric evaluation should be sought. The record is unclear as to how this decision was made and by whom. The district court noted that the defendant deputies – Stoddard, Snider, and Painter – had argued that they did not cause or contribute to the detention. See Order at 6, n.1, I Aplt. App. 256. The court said, however, that genuine issues of material fact as to their participation in her detention precluded summary judgment on Meyer's Fourth Amendment claim on that ground. *Id*.

At some point defendant Deputy Stoddard left the scene and called Western State Psychiatric Center. He returned and informed Officer Wheaton that the Center staff had advised that Plaintiff could be brought in for examination. Plaintiff maintains that from the time the officers arrived until they handcuffed her and took her away, a span of about one hour, she had been calm and cooperative. The unsworn "Peace Officer's Affidavit For Emergency Detention" by Officer Wheaton, which is included in the Western State records, makes no mention of any violence or threats by plaintiff, nor of any resistance to them at any time. III Aplt. App. 682. Officer Wheaton's written statement refers to "affidavits" of other witnesses (apparently referring to written statements given by Beth

Snell, Mark Erwin, and Leon Snell, who also had been present at Wheatland

Commodities) as additional sources of information to support the necessity of emergency

detention, but those statements similarly make no mention of acts or threats of violence

by plaintiff. *Id.* at 683-85.

Plaintiff was taken to Western State, where she arrived in the custody of Wheaton,

Snider, and Painter just before midnight. The district court noted that there was

considerable dispute about the affidavits and reports provided to the Center by the

defendant officers. The medical file contains only Officer Wheaton's statement (which

was styled an affidavit but not notarized), and other unsworn statements of the officers.

In contrast to the evidence adduced in the district court that plaintiff had not been

violent nor threatened violence during the verbal confrontation at Wheatland

Commodities and that she had never resisted the defendant officers, the admitting

physician noted in her report that plaintiff had "apparently" threatened violence and that it

had required four officers to restrain her. There is no written statement from the officers

to support those statements. A later note from the admitting physician says, however, that

she did not "find the entirety of the written police officer material reviewed last night at

this time . . . ." Two persons on duty at Western State at the time of plaintiff's admission

were related to a law enforcement defendant.

The doctor concluded on interviewing plaintiff that she had "the desire to harm"

Erwin and might do so if not detained until she could regain her impulse control. Plaintiff

was admitted to the hospital. She was released the following Monday, May 21st, two days after her admission to the Western State Psychiatric Center.

## III

*The District Court's Opinion*

In its written order on the defendants' motions for summary judgment, I Aplt. App. 251-266, the district court first disposed of the claims against the individual defendants in their official capacities. It is well established that such claims are to be treated as against the governmental entity the official represents. *Id.* at 255. Accordingly, those claims were to be regarded, the court said, as being against the Town of Buffalo or Harper County. Plaintiff does not take issue with this ruling on appeal. Moreover, as previously noted, plaintiff has dismissed her appeal against the Town of Buffalo, and at oral argument she conceded that she did not seek reversal of the judgment in favor of Harper County.

The district judge then considered plaintiff's claims under the Fourth Amendment and the defendants' contention that they were entitled to qualified immunity from suit on such claims under *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), and its progeny. To overcome the defense of qualified immunity, the judge noted, a plaintiff is required to show that the defendants' actions violated a federal constitutional or statutory right, and that the right violated was clearly established at the time of the defendant's actions. *Id.* at 256. *See Greene v. Barrett*, 174 F.3d 1136, 1142 (10th Cir. 1999). The court noted that a

seizure of a person for emergency mental health evaluation involves the same liberty interest that is implicated in a criminal arrest and is therefore subject to the protections of the Fourth Amendment. *See Pino v. Higgs*, 75 F.3d 1461, 1467-68 (10th Cir. 1996). Before a person can be seized and detained for mental health treatment, the officers involved must have probable cause to believe that the person presents a danger to himself or others. The judge noted that plaintiff maintained that she had never been violent, nor threatened violence. The judge then concluded that a jury could find that she was not dangerous to herself or others and that the officers therefore lacked probable cause to detain her. I Aplt. App. 257-58.

The next question, critical in the qualified immunity analysis, was whether the officers could reasonably have believed that their actions were lawful.[2] *Id.* at 258. In a footnote in his opinion, *id.* at 257 n.2, the district judge noted that plaintiff had offered "numerous purported statements of fact" regarding the truthfulness of information given by the defendant officers to Western State. But, the judge said, these raised only questions regarding the officers' subjective state of mind and their compliance with state statutes. Subjective good faith is irrelevant, the judge said, citing *Harlow*, 457 U.S. at 816-18.

---

[2]This question may perhaps be viewed as another formulation of the question whether the right was clearly established. "For a right to be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Greene*, 174 F.3d at 1142 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

The judge then cited *Saucier v. Katz*, 533 U.S. 194, 202 (2001), and *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (*per curiam*), for the principle that an officer must be granted qualified immunity if, in light of clearly established law and the information the officer possessed, a reasonable officer could have believed his actions were lawful. Even absent actual threats, the judge went on,

> a reasonable officer could have concluded that Ms. Meyer was mentally unstable and that she was seeking out harm to herself. Such a conclusion could support a reasonable, if mistaken, belief that Ms. Meyer presented a substantial chance of dangerous behavior to herself or to Mr. Erwin or Ms. Snell. Even a mistaken belief as to the presence of probable cause is sufficient to clothe the defendant officers with qualified immunity. . . .

I Aplt. App. 259. The judge concluded that plaintiff had failed to show that it was clearly established that these facts would have been insufficient to give rise to probable cause to take her into custody for an emergency mental health evaluation. He further observed that in fact there was a distinct lack of clarity as to what constitutes probable cause in regard to detentions for psychological evaluations. *Id.* Therefore the judge rejected Meyer's Fourth Amendment claim on the basis of the qualified immunity defense.

The judge held that the plaintiff's Fourteenth Amendment claims based on procedural and substantive due process were unavailing. *Id*. at 260. The judge noted that this court has recognized that seizures for mental health evaluations are analogous to criminal arrests and that the Fourth Amendment requirement of probable cause defines the measure of due process in such cases. *See Pino v. Higgs*, 75 F.3d 1461, 1469 (10th Cir. 1996).

- 10 -

Plaintiff also raised First Amendment claims. She alleged that she was thwarted in her efforts to file a report of criminal assault against defendant Erwin, and that her detention and commitment were retaliation for her attempt to do so. The judge held that plaintiff had failed to show any causal nexus between her assault report and her detention. He said the uncontroverted facts showed that plaintiff was not engaged in protected speech at the time she was taken into custody. The officers were responding to the call for assistance based on her trespassing and "acting crazy." Mere speculation about the officers' motives could not prevail in summary judgment proceedings.

Next the district judge considered the claims against the Board of Commissioners of Harper County and the Town of Buffalo. Invoking the well-settled principle that a municipality cannot be held liable vicariously, the judge examined plaintiff's attempt to hold the entities directly liable. Plaintiff had alleged failure to train and failure to supervise. But liability on such basis is only imposed where the inadequacy amounts to deliberate indifference to the rights of citizens. Plaintiff had failed to provide any evidence to support such a finding against the town or the county, the judge held. And he noted that the claim against the county was especially weak because in Oklahoma, county commissioners have no duty to hire, train, supervise or discipline the county sheriffs or their deputies, absent a showing that the sheriff or deputy in question was executing an unconstitutional policy of the commissioners themselves. *Meade v. Grubbs*, 841 F.2d 1512, 1528 (10th Cir. 1988).

Finally, invoking 28 U.S.C. § 1367(c)(3), the district judge dismissed plaintiff's state law claims without prejudice.

**IV**

*Analysis*

A

We first address plaintiff's challenge on appeal to the district court's qualified immunity ruling on the Fourth Amendment issues. At the outset, we may note three points in the district court's analysis that are clearly correct and are unchallenged on appeal. First, the seizure of a person for an emergency mental health evaluation is a restriction on the fundamental right of personal liberty and so is governed by the reasonableness requirement of the Fourth Amendment. *Pino v. Higgs*, 75 F.3d 1461, 1468 (10th Cir. 1996). The second principle, which follows from the first, is that probable cause is required to support an emergency detention for a psychiatric evaluation. *Id.* Third, the district judge stated that probable cause in this context means cause to believe that the individual poses a danger to himself or others, citing *Monday v. Oullette*, 118 F.3d 1099, 1102 (6th Cir. 1997). This predicate for the district court's analysis is not challenged on appeal and is in accord with our precedents: "[A] state official is not entitled to qualified immunity if 'there is a genuine issue of material fact concerning whether a reasonable person, exercising professional judgment and possessing the information before the defendant, would have believed that [an individual was a danger to

himself or others].'" *Scott v. Hern*, 216 F.3d 897, 910 (10th Cir. 2000) (quoting *Walters v. Western State Hosp.*, 864 F.2d 695, 699 (10th Cir. 1988)).

The focus of the parties' appellate arguments is the district judge's ruling that the defendants were entitled to qualified immunity because the plaintiff's right was not so clearly defined that a reasonable officer would have known that his conduct was unlawful. In this context, the right at issue takes on a specific meaning which must be understood for clarity of analysis. The right allegedly violated – the right to liberty – is well understood in its broad, general sense. But in this analysis the term stands for something considerably more specific and limited. It is Ms. Meyer's right not to be detained involuntarily for psychiatric evaluation or treatment without probable cause to believe – that is a reasonable perception of a probability or substantial chance – that she posed a danger to herself or others. *See Monday v. Oullette*, 118 F.3d at 1102.

The district judge noted that cases have not provided a clear definition of what constitutes "probable cause" in this context. "Far from being clearly established," the judge said, the concept is quite unclear; there is a "distinct 'lack of clarity'" to the term in this area of the law, the judge observed. The defendants rely heavily on this proposition in asserting that the judge correctly decided the qualified immunity issue. The judge held that a "reasonable officer could have interpreted Ms. Meyer's behavior as inappropriate and irrational." Applying the well-established legal principle that even a mistaken belief that probable cause exists is a sufficient basis for the courts to grant qualified immunity,

and with the boundaries of probable cause being unclear, the judge held that the officers must be protected from suit.

Two distinct reasons convince us that the district court erred. First, the meaning of probable cause in the context of a mental health detention is not nearly as ambiguous as the district court would have it. This Court has held that seizure of a person for an emergency mental health evaluation is "closely analogous" to "criminal arrest," and must be supported by probable cause sufficient to justify a criminal arrest. *Pino v. Higgs*, 75 F.3d 1461, 1468 (10th Cir. 1996). To be more specific, officers who decide to commit an individual for a mental health evaluation must be able to articulate specific facts that lead them to believe the person is a threat to herself or others. *See Anaya v. Crossroads Managed Care Sys., Inc.,* 195 F.3d 584, 591-92 (10th Cir. 1999); *Pino*, 75 F.3d at 1468; *Monday*, 118 F.3d at 1102. Ms. Meyer has presented evidence that Officers Snider, Stoddard and Painter attempted to commit her to a mental health facility following a verbal altercation in which there was no violence, no threats of violence, or damage to property. Ms. Meyer never threatened or hindered the police. On the contrary, she complied with the officers' request to remain in her vehicle for upwards of an hour while they interviewed bystanders, and she willingly accompanied officers to the police station thereafter. In short, the officers have articulated no reason to believe Ms. Meyer was a threat to herself or others, or that she had or was about to commit an act of violence.

Second, even were the meaning of probable cause in this context not so clearly

established, we are persuaded that the district court erred in disregarding evidence which would have supported a jury finding that one or more of the officers deliberately lied in order to detain Ms. Meyer. As we have said before, "[t]he more obviously egregious [officers'] conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004).

If the district court's analysis took into account all of the facts which must be taken as true at the summary judgment stage, and if the district court's rejection of what we perceive to be the critical facts in this case were not based on a legal error, we would agree with this analysis. But we conclude that the district court erred in disregarding evidence which would have supported a jury finding that one or more of the officers deliberately lied in order to effect the detention of the plaintiff. The judge disregarded that evidence because he erroneously held that evidence of deliberate misconduct would be irrelevant to the objective inquiry required in the qualified immunity context because it would go only to the officers' subjective state of mind.

As we noted *supra*, the notes of the admitting physician at Western State said that plaintiff had "apparently" threatened violence. Nothing in the written statements submitted to the physician by the defendants – at least the ones still extant in the Western State records – support those statements. A later note by the doctor says that she did "not find the entirety of the written police officer material reviewed last night at this time . . .

." The physician's notes say that it took four officers to subdue the plaintiff. Again, nothing in the written statements submitted to the physician – at least none that are still available – support that statement. On appeal, defendants do not contend that plaintiff was ever violent or threatened violence, except to the extent that her behavior could be taken as inviting Mark Erwin to do violence to her.[3] In our study of the record, we have not found any allegation by the defendants, much less evidence tending to show, that plaintiff had been violent, threatened anyone, or resisted arrest. In short, the statements in the doctor's admission notes on such unruly conduct are entirely without support in the evidence in this lawsuit.

Thus we have a marked discrepancy between the doctor's notes regarding reports of plaintiff's violent behavior and the total lack of evidence that any such behavior occurred. Plaintiff does not point to direct evidence of intentional misconduct by the defendants to explain this discrepancy. But plaintiff is entitled at the summary judgment stage to any reasonable inferences that a jury might draw from the evidence. Plaintiff has provided some circumstantial evidence to support her allegations that the defendant officers knowingly provided false information in order to have her committed.

We have already mentioned most of the evidence that plaintiff contends would support a jury inference that one or more of the defendant officers intentionally supplied misinformation to support her detention. The importance of this point, however, merits

_____

[3]Plaintiff asserts that what she meant when she said something to the effect of "just finish this," was to complete their verbal confrontation.

- 16 -

our collection and review of that evidence. In particular, Ms. Meyer relies on the discrepancy we have noted between the admitting doctor's notes reflecting reports that plaintiff had been violent with the complete absence of any evidence to support the reports. Then there is the doctor's observation in her notes that not all written statements provided by the officers at the time of admission could be found in the hospital's file the next day. We have also noted previously that the defendant officers were all friends of Mark Erwin and that plaintiff had met considerable resistance in her attempts to report the alleged assault on her by Erwin outside her rural home on May 17-18. We have also noted that when the officers came to the Wheatland Commodities office in response to Beth Snell's report that plaintiff was creating a disturbance, the officers interviewed everyone present except plaintiff.

Additionally, plaintiff has produced some evidence regarding communications with Western State staff preceding her admission. This evidence is in the form of an affidavit from a nurse who was on duty that night, Ms. Seabourn. In that affidavit, Ms. Seabourn describes how she received a phone call from a dispatcher with Harper County. When the caller said that she needed to talk to the admissions office, Ms. Seabourn replied that she was the registered nurse on duty with admissions at the time and so was the person to whom the dispatcher should be speaking. The dispatcher resisted that suggestion and said that she needed to speak to "admissions" instead. Ms. Seabourn repeated that she was the person assigned to receive information regarding admissions.

The dispatcher then told Ms. Seabourn that a white female was being brought in for admission from Harper County under an emergency order of detention, that this person had been violent that evening, and that it was going to take three or four officers to bring her to the hospital. During this call, Ms. Seabourn said, Crystal Stoddard (originally a defendant in this case and the wife of defendant Shawn Stoddard, a Harper County Deputy Sheriff) came into the room and tried to interrupt the conversation. Crystal Stoddard said that the telephone call was for her, and that she needed to take the call. After the call had ended, Seabourn notified Dr. Morris, who told her she had already been notified of this situation and of the reported violence of the person discussed. Seabourn further said that it was "outside of the normal procedures in effect at that time" for the psychiatrist to have received information in advance from outside the hospital. III Aplt. App. 880-83.

Defendants make a cursory assertion in their brief that plaintiff's allegations of possible intentional misconduct are not supported by admissible evidence. It is unclear whether defendants meant to say that the references in the Western State records are not admissible, or that there is no admissible evidence that the misstatements about plaintiff's behavior in those records were provided by them. In the district court's order, the judge rejected the plaintiff's reliance on intentional misconduct on erroneous legal reasoning, which we address next. In the footnote discussing the point, the judge said only that the allegations were immaterial "[t]o the extent those allegations are supported by any

admissible evidence . . . ." I Aplt. App. 257 n.2.

This court cannot review the defendants' vague challenge on an evidentiary issue which the district court addressed in such a perfunctory and ambiguous fashion. As noted, it is not clear what assertion defendants are making, and we are not charged with making the parties' arguments for them. Defendants have not shown that they raised any evidentiary objection on this proffer in the district court. Nor is it clear what the district judge meant in his ambiguous comment. Therefore, at this stage of this litigation, this panel must assume that the admitting physician relied on reports that plaintiff had been so violent the evening of her admission that it had taken four police officers to restrain her. From this basis, we conclude that a reasonable jury *could* find that this misinformation came from one or more of the defendant officers, acting either alone or in concert. We must next assess the legal import such a jury finding could have.

First, we reject the district court's conclusion that evidence of deliberately submitting false information to influence Western State to admit the plaintiff is irrelevant to the qualified immunity analysis. We do not, of course, disagree with the general point that subjective good faith or bad faith of government actors is ordinarily irrelevant to the objective inquiry whether a reasonable officer would have realized that his conduct was unlawful. *See Harlow v. Fitzgerald*, 457 U.S. at 816-18. But deliberate misconduct is something different. It is clearly relevant to the objective inquiry. In short, a reasonable officer would know that he cannot rely on deliberate falsehoods to establish probable

cause to deprive a person of her liberty.

We held in *Snell v. Tunnell*, 920 F.2d 673, 698-699 (10th Cir. 1990), that officials who relied on false information to obtain a search warrant for the home of foster parents were not entitled to qualified immunity. The district court found *Snell* irrelevant because it did not involve a mental health detention. That focus was much too narrow. Instead, the broader principle is directly relevant here, and *Snell* is not the only case in which we have enunciated the broader principle. Put most directly, "conduct [may be] so bad that case law is not needed to establish that this conduct cannot be lawful." *Vinyard v. Wilson*, 311 F.3d 1340, 1350 (11th Cir. 2002). We have cited that language with approval and have also noted that "[t]he more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004). In *Pierce*, we also said that it was beyond doubt that "the prohibition on falsification or omission of evidence, knowingly or with reckless disregard for the truth, was firmly established as of 1986, in the context of information supplied to support a warrant for arrest." *Id.* As we said in *Snell*, evidence of deliberate misconduct "differentiates this case from others in which qualified immunity has been granted." 920 F.2d at 697. At some point, an officer's knowledge of false information may defeat a finding of objective reasonableness . . . ." *Id.* at 698 (citation omitted).

In short, *someone* made an untrue statement that the plaintiff had been violent, a

- 20 -

statement on which the admitting physician seems to have relied – at least in part – in making the decision to admit plaintiff involuntarily. And there was at least some evidence that the defendant officers were friends with defendant Erwin, against whom plaintiff had attempted to make a criminal complaint. There was some evidence that the defendant officers were at best reluctant to permit plaintiff to make the complaint against Erwin. The evidence leaves many facts in dispute and permits divergent inferences to be drawn. In short, on this record it clearly appears that the district court erred in granting the defendants' motion for summary judgment on plaintiff's Fourth Amendment claim on the basis of a qualified immunity defense.[4]

B

We conclude that the district court also erred in granting summary judgment for the defendants on the plaintiff's First Amendment claim.

This claim was that plaintiff was detained and committed in retaliation for her exercise of her First Amendment rights, specifically her effort to file a report on her physical assault by Mr. Erwin. The district judge did not rule on whether that effort was protected speech. Instead, he held that plaintiff had failed to show any causal nexus

---

[4]The district court rejected the plaintiff's Fourteenth Amendment claim. Citing *Pino v. Higgs*, 75 F.3d 1461, 1469 (10th Cir. 1996), the judge held that her claim must be brought only on the more specifically applicable guarantees of the Fourth Amendment. Plaintiff conceded at oral argument that she did not challenge this ruling on appeal. That ruling of the district court therefore stands.

between such speech and the detention of plaintiff.

We have held that denying the ability to report physical assaults is an infringement of protected speech. *See Seamons v. Snow*, 84 F.3d 1226, 1238 (10th Cir. 1996). In this connection, we are persuaded by the unpublished opinion in *Rupp v. Phillips*, 15 Fed. Appx. 694 (10th Cir. 2001). There we held that reporting a danger of commission of crimes was protected by the First Amendment. We thus conclude that "filing a criminal complaint with law enforcement officials constitutes an exercise of the First Amendment right" to petition the government for the redress of grievances. *Estate of Morris v. Dapolito*, 297 F. Supp. 2d 680, 692 (S.D.N.Y. 2004). Under these precedents we agree with plaintiff that her attempt to report an alleged criminal offense was conduct protected by the First Amendment.[5]

As for the causal link, direct evidence of retaliatory intent is rarely available. Therefore, we must consider the reasonable inferences that may be drawn from the available evidence. Plaintiff relies on evidence that the defendants resisted her efforts to

[5]Defendants contend that the "frivolity" of plaintiff's claim is shown by recognition of the rule that a private person has no cognizable interest in the criminal prosecution of another, citing *Linda R. S. v. Richard D.*, 410 U.S. 614 (1973). We disagree. The distinction is that this case involves the right to present a criminal complaint, which is a form of the right to petition for redress of grievances, and thus one of the most basic of all constitutional rights. In a non-precedential but persuasive opinion from one of our district courts addressing a closely analogous situation, the district judge said: "While Plaintiff did not have a right to force the local prosecutor to *pursue* her charges, she possessed the right to *access* judicial procedures for redress of her claimed wrongs and to 'set in motion the governmental machinery.'" *Howse v. Atkinson*, 2005 WL 1076527, No. CIV.A. 04-2341 (D. Kan. May 4, 2005) (VanBebber, J.) (emphasis added).

file an assault complaint against Erwin. The first time she attempted to report the assault (at her home when she reported the trespass the following night), the deputy sheriff wouldn't take the report. When she went to the sheriff's office, she was told that they "didn't do that there." Then, at the first opportunity, she asserts that the officers – all of whom are friends of Erwin – took her into custody and allegedly said falsely that she was violent in order to have her committed to the state hospital. These allegations are sufficient, she claims, to support an inference of retaliatory motive.

We conclude that the evidence is sufficient for a reasonable jury to find retaliation. We have held that the jury could find that defendants made false statements in order to effect plaintiff's detention at Western State. If the jurors were to draw that inference, then they could consider whether the evidence of retaliation was persuasive. In that context, we note, no other motive has been suggested. (Which is not surprising because the defendants deny that the conduct occurred.) The crucial point, of course, is that it is for the jury to decide what inference to draw. Thus the summary judgment dismissal of the First Amendment claim was error.

C

Finally, because we hold that plaintiff's federal claims were wrongly rejected, we will also reverse the dismissal without prejudice of her state law claims and remand them for further consideration. *See Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 987 n.7 (10th Cir. 2003).

- 23 -

*Conclusion*

The summary judgment of the district court in favor of Shawn Stoddard, Josh Snider, and Tommy Painter, on plaintiff's First Amendment and Fourth Amendment claims is REVERSED. The district court's ruling that claims against the officers in their official capacities were to be regarded as claims against the governmental entities is AFFIRMED. The judgment in favor of the Board of Commissioners of Harper County is AFFIRMED. The district court's dismissal of plaintiff's state law claims is REVERSED. This matter is REMANDED for further proceedings.

IT IS SO ORDERED.