**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**July 19, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

TAJ BECKER, M.D.,

      Plaintiff-Appellant-Cross
Appellee,

  v.

J. DENIS KROLL, JEFF WRIGHT,
TERRY ALLEN, Ph.D., GORDON
VAN BALLEGOIE, and MICHELLE
HERBERT, in their individual, official
and representative capacities,

      Defendants-Appellees-
      Cross Appellants.


GARY R. EVANS, MARK
SHURTLEFF, DAVID GARDNER,
JOHN DOES 1-20, in their individual,
official and representative capacities,

      Defendants-Appellees.


THE ASSOCIATION OF AMERICAN
PHYSICIANS & SURGEONS,

      Amicus Curiae.

Nos. 05-4070 and 05-4096[*]

---

    [*] This Cross-Appeal raises no issues not implicated by the Appellant's brief.

**APPEAL FROM THE UNITED STATES DISTRICT COURT
(D.C. NO. 2:02-CV-24-DAK)**

Robert R. Wallace, Kirton & McConkie, Salt Lake City, Utah, for Plaintiff-Appellant-Cross Appellee.

Debra J. Moore, Assistant Utah Attorney General, Salt Lake City, Utah, for Defendants-Appellees-Cross Appellants.

J. Clifford Petersen, Assistant Utah Attorney General, Salt Lake City, Utah, for Defendants-Appellees.

Andrew L. Schlafly, Far Hills, New Jersey, on brief for Amicus Curiae.

Before **TYMKOVICH**, **McWILLIAMS**, Circuit Judges, and **EAGAN**, District Judge.[**]

**TYMKOVICH**, Circuit Judge.

Taj Becker is a medical doctor in St. George, Utah, who participated in Utah's Medicaid program. Between 1998 and 2001, she was investigated by Utah's Medicaid Fraud Control Unit (MFCU) for alleged billing irregularities. The investigation culminated with the filing of a civil complaint and criminal charges. Those charges were later dismissed by state prosecutors concerned about the methods MFCU used to obtain records and assess Becker's billing practices.

[**] The Honorable Claire V. Eagan, Chief Judge, United States District Court for the Northern District of Oklahoma, sitting by designation.

After the charges were dismissed, Becker brought claims under 42 U.S.C. § 1983, alleging that the MFCU investigation was a sham to force her to pay civil penalties to avoid criminal prosecution. Her lawsuit was based on several federal and state theories, which she has distilled on appeal to the following: (1) malicious prosecution under the Fourth and Fourteenth Amendments; (2) outrageous conduct in violation of substantive due process under the Fourteenth Amendment; (3) retaliation under the First Amendment; and (4) libel under state law.

For the reasons discussed herein, we AFFIRM the district court's grant of summary judgment to the defendants as to the Fourth and Fourteenth Amendment claims, and we REVERSE and REMAND the First Amendment retaliation and state law libel claims.

## I. Factual Background

Becker is a board-certified neurologist practicing in St. George, Utah. Her claims arise out of a criminal investigation and prosecution by MFCU, a task force assigned to combating Medicaid fraud in Utah. The MFCU investigation centered on a suspicion that Becker "up-coded" or over-billed the government for

services performed for Medicaid patients in her care.[1]  The facts of this case are best understood chronologically.

*MFCU Begins an Investigation and Subpoenas Becker's Records*

In early to mid-November 1998, Becker's billings to Medicaid were flagged by MFCU research analyst Terry Allen.  Allen concluded that Becker's bills showed evidence of possible up-coding.  Allen's work was the basis for an initial investigation by Sergeant Jeff Wright, the chief investigator for MFCU.  Wright's investigation allegedly supported Allen's conclusion that Becker may have up-coded.  As a result, J. Denis Kroll, the Assistant Utah Attorney General who served as MFCU's lead prosecutor, sought and received permission from a state judge to issue subpoenas for Becker's medical records.

On the morning of November 17, 1998, Wright and MFCU medical investigator Michelle Hebert-Snow arrived unannounced at Becker's office and demanded that she produce certain medical records for copying.  The subpoena requested billing records for forty-seven randomly-selected patients between 1995 and 1998.  Wright informed Becker that since she had signed a provider agreement with Medicaid, he was entitled to the records.  Becker informed Wright

---

[1] Up-coding is over-billing of a particular kind: it is the practice of billing the government for a more expensive medical service than the service actually provided the Medicaid patient.  Because Medicaid has a special billing code for thousands of individual medical procedures, the term "up-coding" is used to indicate the use of a higher code in the billing than is justified by the procedure performed.

that she would only produce the records pursuant to a subpoena. Wright then provided Becker with what appeared to be a facially valid subpoena for the records. The subpoena provided that Becker could refuse to turn over the records immediately and appear a few days later in Salt Lake City if she wanted to contest the subpoena.[2] After reviewing the subpoena, Becker chose not to challenge it and instructed her staff to produce the records immediately. Wright and others from MFCU removed and copied dozens of patient records, which they returned to Becker's office later that day. Hebert-Snow performed an initial review of the copied records and concluded that Becker had likely up-coded.

*MFCU Threatens Prosecution and Proposes Settlement of the Charges*

Becker was then asked to come to Salt Lake City to meet with Kroll to discuss the investigation. On January 20, 1999, Becker traveled to Salt Lake City and met with Kroll, Wright, and Hebert-Snow. According to Becker, this meeting was first an interview and then an impromptu settlement conference. Specifically, Becker claims she was told that if she did not pay $107,000 to MFCU within two weeks, she would face criminal prosecution. In his own words, Kroll testified that he informed Becker of the "parade of horrors" and "how bad it could get" if MFCU filed criminal charges. Supp. App. Aple. Kroll, et al. 294–97.

---

[2] It is worth noting that Salt Lake City is approximately 300 miles northeast of St. George.

-5-

Becker maintained she was innocent of any up-coding and refused to settle with MFCU. Becker argued to Kroll that the medical experts who had reviewed her billing practices were not neurologists and therefore had no expertise to determine the validity of her billing statements. Following this exchange, and without telling Becker, MFCU contracted with Dr. Vine, an independent neurologist, to review Becker's records. Vine concluded that Becker's billing practices were appropriate.

In April 1999, Kroll again contacted Becker and offered to waive any criminal prosecution if Becker would pay $49,605 to MFCU. Kroll provided Becker with a draft criminal complaint against her seeking $646,000 in damages. Becker again maintained her innocence and refused to settle.

*MFCU Files and Withdraws Civil Suit*

On June 24, 1999, Kroll filed a civil suit against Becker, asking for $25,000 in damages plus fines and investigative costs. According to Kroll, he filed the suit as part of settlement discussions with Becker, and he dismissed the civil action less than two weeks later on July 7, 1999 when settlement failed to materialize.

Following the dismissal of the civil action, Becker began to publicly respond to the MFCU investigation. First, in November 1999, she filed a Notice

of Claim against MFCU.[3]  She and her husband also initiated a letter-writing campaign in which they contacted the Governor, federal and state legislators, and other officials, detailing what Becker believed were unprofessional investigative practices and bullying tactics of MFCU.  Only one letter in the record, sent to the Chairman of the Utah Senate Appropriations Committee, and copied to the Chairman of the Utah House Appropriations Committee and the Utah Governor, is dated prior to the filing of criminal charges against Becker.

The state decided in 1999 to transfer oversight of MFCU from the Utah Department of Public Safety to the Attorney General's Office, a transfer the district court attributed to political pressure from rural doctors claiming maltreatment by MFCU.  In December 1999, David Gardner took over Kroll's position as the lead prosecutor for MFCU.  Kroll became interim director of MFCU.[4]

---

[3]  A Notice of Claim is required under Utah law where any citizen seeks recovery from an arm of the state government.

[4]  The parties seem to disagree about when the transfer to the Attorney General's Office occurred.  Defendants' brief suggests the transfer took place in July 1999.  Aples. Kroll et al. Br. 20.  Becker's brief does not provide a date for the transfer, but Gardner stated in his deposition that control of MFCU was transferred to the Utah Attorney General's Office after he began working there in December 1999.  Aplt. App. 224.  To the extent this establishes a factual issue, we view it in the light most favorable to Becker.  We therefore assume the transfer took place in December 1999 after Becker began speaking publicly about MFCU's tactics.

*MFCU Files a Criminal Complaint*

On January 11, 2000, MFCU filed felony charges in state court concerning Becker's billing practices. That same day, Becker's husband testified before a state legislative committee about MFCU's alleged prosecutorial abuses. According to Gardner, he made the decision to file criminal charges based in part on an information and affidavit signed by Wright, one of the original MFCU investigators on the case. Gardner also discussed the case with several other prosecutors, including his supervisors, before he decided to file charges against Becker. Shortly after the criminal charges were filed, Wright was transferred out of MFCU to a different department although he later testified at Becker's preliminary hearing.

At the preliminary hearing on July 11, 2000, the prosecution presented evidence in support of the charges. Prior to the defense presenting any evidence, the court stated, "I believe the State has provided sufficient evidence on each of those elements and, accordingly, I bind you over." Supp. App. Aple. Kroll, et al. 580. After making this statement, the court then acknowledged that the court "probably acted prematurely in doing this bind over" because Becker was not given an opportunity to testify. *Id.* Becker, through her attorney, then chose not to present any evidence at the preliminary hearing given the court's earlier

statement.[5]

*MFCU Withdraws Criminal Complaint Due to Irregularities in*
*Investigation*

Shortly after the preliminary hearing, Gardner became aware of several
irregularities in the investigation. In particular, Gardner learned that Becker's
medical records were not obtained voluntarily as Wright had originally led him to
believe. Gardner also discovered that there never had been a return of service
filed with the court with respect to the subpoenas, as required under Utah law,
and that key meetings between Becker and MFCU members had not been
documented, including the January and April 1999 settlement offers. Gardner
further discovered that MFCU had consulted with Dr. Vine, and that Dr. Vine had
found no irregularities in Becker's billing and Medicaid coding practices. Dr.
Vine's review and conclusions regarding Becker's billing records were not
documented in the MFCU case file and were never provided to Becker as
potential exculpatory evidence. Because of these irregularities, Gardner

---

[5] Becker disputes that she was ever actually bound over for trial under
state law because the judge did not sign the required minute entry. For unknown
reasons, a minute entry was stamped with the state judge's signature by the clerk
of court several months after the minute entry was originally entered. The court
clerk who stamped the minute entry with the judge's signature cannot recall
whether she stamped the minute entry at the request of someone else or on her
own volition. Nevertheless, the court clerk's testimony is clear that she did not
stamp the minute entry at the direction of the judge.

concluded that the key evidence would likely be suppressed prior to trial and dismissed the criminal case with prejudice on September 6, 2000.

*Becker Cleared at Administrative Hearing but Judged on World Wide Web*

Gardner instead referred the case to the Utah Division of Health Care Financing for administrative action. An agency action was brought against Becker to recover $5,000 allegedly collected by means of fraudulent up-coding. After a hearing on the merits, Becker was found to owe nothing.

On January 12, 2001, MFCU nevertheless published an account of Becker's case on its website as a part of its statutorily-required annual report. The report was worded in a way to make it appear as though Becker was guilty of up-coding despite the dismissal of the criminal case and the later administrative determination in favor of Becker. The relevant section of the report was drafted by Gardner at the request of Gale Evans, who became MFCU director in August 2000. MFCU removed the report from its website on May 19, 2001, after complaints from Becker of its libelous nature.

*Becker's Allegations Regarding Defendants' Motivation*

Becker claimed in district court that MFCU engaged in a scheme to charge innocent physicians in rural areas with Medicaid fraud to increase fraud recoveries for MFCU. Becker asserts that the investigation of her and other rural doctors began only after department supervisors placed pressure on MFCU to improve its financial recoveries. MFCU is required to submit quarterly statistical

reports to the federal Office of the Inspector General–State Medicaid Oversight and Policy, which bases financial grants in part on fraud recovery performance and can de-certify Medicaid fraud units on the basis of poor recoveries. Becker claims this dynamic put financial pressure on MFCU to justify its existence and caused members of MFCU to prosecute innocent persons, particularly rural doctors who were more likely to pay the requested fines than incur the high costs associated with fighting a legal battle with MFCU.

## II. Procedural History

Becker initially filed suit in January 2002 in the United States District Court for the District of Utah under 42 U.S.C. § 1983 and state law. Her third and final amended complaint, filed in January 2004 alleged nine causes of action: (1) denial of due process; (2) extortion/bribery; (3) retaliation for speaking out on a matter of public concern; (4) libel; (5) malicious prosecution; (6) declaratory judgment; (7) injunction; (8) conspiracy; and (9) substantive due process. The district court issued two rulings on summary judgment. First, in October 2004 it granted summary judgment in favor of all defendants on all claims except the malicious prosecution and related conspiracy claims against Kroll and Wright. *Becker v. Kroll*, 340 F. Supp. 2d 1230 (D. Utah 2004).

In March 2005, the district court then granted Kroll and Wright's Renewed Motion for Summary Judgment as to the remaining claims on the ground that a malicious prosecution claim cannot proceed when the plaintiff was never "seized"

under the Fourth Amendment.  Without evidence of seizure, the § 1983 claims

and the related conspiracy claims were dismissed.  Becker timely appealed both

summary judgment orders.

### III.  Analysis

We review the district court's grant of summary judgment de novo using

the same standard as the district court.  *Croy v. COBE Labs, Inc.*, 345 F.3d 1199,

1201 (10th Cir. 2003).  Summary judgment is appropriate only when "there is no

genuine issue as to any material fact." Fed. R. Civ. P. 56(c).  We determine

whether the evidence proffered by the plaintiff, if believed by the fact-finder,

would be sufficient to sustain the claim, *Foster v. AlliedSignal, Inc.*, 293 F.3d

1187, 1195 (10th Cir. 2002), and draw all reasonable inferences from the

evidence in the manner most favorable to the plaintiff.  *Fisher v. Okla. Health

Care Auth.*, 335 F.3d 1175, 1180 (10th Cir. 2003).

Becker contends that the district court erred in granting summary judgment

on her federal constitutional and state libel claims.[6]  In particular, she claims that

---

[6] Becker has waived appellate review of several other claims.  Federal Rule
of Appellate Procedure 28(a)(9)(A) requires appellants to sufficiently raise all
issues and arguments on which they desire appellate review in their opening brief.
An issue or argument insufficiently raised in the opening brief is deemed waived.
*Headrick v. Rockwell Int'l Corp.*, 24 F.3d 1272, 1277–78 (10th Cir. 1994).  By
not raising them in her opening brief, Becker has waived all her claims against all
defendants/appellees in their official capacities that were properly dismissed by
the district court on Eleventh Amendment grounds.  Becker has also waived the
entirety of her claims against Utah Attorney General Mark Shurtleff by failing to
explicitly challenge the district court's dismissal of claims against him and by

(continued...)

-12-

the defendants violated her constitutional rights in three ways: (1) malicious prosecution under the Fourth and Fourteenth Amendment; (2) outrageous conduct under the Fourteenth Amendment's substantive due process component; and (3) retaliation under the First Amendment. Her libel claim rests on whether the district court correctly applied Utah law.

We note that what Becker addresses in her brief as separate claims—malicious prosecution, violation of procedural due process, and violation of substantive due process—all amount to the claim that she was investigated and prosecuted without probable cause. We therefore address all of her claims under the Fourth and Fourteenth Amendments as malicious prosecution claims. We then address her claims for First Amendment retaliation and libel.

**A. Malicious Prosecution Claims Under the Fourth and Fourteenth Amendments**

This case requires us to wade into the murky waters of § 1983-based malicious prosecution claims. Section 1983 provides a federal civil cause of action against state officials for the "deprivation of any rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983. Claims under § 1983

---

[6](...continued)
failing to include him in her description of the parties in her brief on appeal. Additionally, Becker has waived her malicious prosecution claim against all defendants/appellees except Kroll and Wright by challenging dismissal only as to those two defendants. Finally, Becker stipulated below that her procedural due process and substantive due process claims do not apply to defendant/appellee Gardner. These claims are therefore also waived.

are often analytically similar to—although still distinct from—common law torts, such as malicious prosecution. Most recently, in *Pierce v. Gilchrist*, 359 F.3d 1279 (10th Cir. 2004), for example, we examined a claim for malicious prosecution under § 1983, recognizing the uneasy relationship between § 1983 constitutional torts and state common law causes of action. As we observed in *Pierce*, 359 F.3d at 1286, "[s]ince *Carey v. Piphus*, 435 U.S. 247 (1978), courts have used the common law of torts as a 'starting point' for determining the contours of claims of constitutional violations under § 1983." In other words, the common law tort—while not entirely imported into § 1983—provides a useful guidepost in making sense of alleged constitutional injuries. *See id.* at 1286 n.3. In some instances, a common law tort is sufficiently analogous to the alleged constitutional violation that its common law elements are grafted onto and themselves become elements of a § 1983 constitutional tort. But not all § 1983 actions have a common law analog, and no § 1983 action depends entirely on a common law analog to define its elements.

The core inquiry under any § 1983 action, regardless of the analogous common law tort, is whether the plaintiff has alleged an actionable constitutional violation. *Id.* at 1290 (citing *Taylor v. Meacham*, 82 F.3d 1556, 1561 (10th Cir. 1996)). The district court dismissed Becker's claim because it determined that no seizure existed under the Fourth Amendment which would support a § 1983 action for malicious prosecution.

Becker argues the district court erred in two respects in considering her claims: she argues (1) that criminal charges alone, even though subsequently dismissed, constitute a sufficient restraint on her liberty to qualify as a seizure under the Fourth Amendment, and (2) that MFCU also violated her due process rights during the course of the investigation, which provides an additional constitutional basis for her malicious prosecution cause of action.

We have repeatedly recognized in this circuit that, at least prior to trial, the relevant constitutional underpinning for a claim of malicious prosecution under § 1983 must be "the Fourth Amendment's right to be free from unreasonable seizures." *Taylor*, 82 F.3d at 1561; *see Pierce*, 359 F.3d at 1285–86. Although we agree with the district court that a seizure is necessary to support a § 1983 malicious prosecution claim based on the initiation of criminal proceedings that are dismissed before trial, we also discuss whether Becker may rely on a theory that the defendants deprived her of liberty or property interests without due process of law in violation of the Fourteenth Amendment.[7] We conclude that Becker has not alleged a constitutional violation under either Amendment.

---

[7] Becker does not distinguish between her Fourth Amendment-based search and seizure claims (as applied to the states through the Fourteenth Amendment) and her procedural due process claims. We address these arguments separately for the sake of analytical clarity.

### *1. Was There a Fourth Amendment Seizure?*

The Fourth Amendment protects the right of citizens to "be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Becker advances two arguments under which MFCU violated her Fourth Amendment rights. First, she argues that MFCU unreasonably seized her person because the investigation into her billing practices imposed burdens on her time, finances, and reputation by requiring her to travel to and attend meetings, pay legal costs, and, eventually, face criminal charges. Second, she argues that MFCU unreasonably seized her property when it copied her medical records.

### a. Seizure of Person

"Violation of the Fourth Amendment requires an intentional acquisition of physical control." *Brower v. County of Inyo*, 489 U.S. 593, 596 (1989). In our cases analyzing malicious prosecution under § 1983, we have always proceeded based on a seizure by the state—arrest or imprisonment. *See, e.g., Pierce*, 359 F.3d at 1281 (plaintiff incarcerated for fifteen years); *Taylor*, 82 F.3d at 1558 & n.5 (plaintiff arrested and held for seven weeks); *Wolford v. Lasater*, 78 F.3d 484, 487 (10th Cir. 1996) (plaintiff arrested). Here, Becker conceded she was never arrested, incarcerated, or otherwise placed under the direct physical control of the state. Accordingly, Becker was never "seized" in the traditional sense.

Becker nonetheless argues that we should adopt a broader theory of seizure, based on the Supreme Court's decision in *Albright v. Oliver*, 510 U.S. 266 (1994). In that case, the Court concluded that the Fourteenth Amendment does not provide a *substantive due process* right to be free from prosecution without probable cause, but left open the possibility that a plaintiff could bring such a claim under the Fourth Amendment. In a noteworthy concurrence to the Court's plurality opinion, Justice Ginsburg analyzed Albright's claim under the Fourth Amendment and urged the Court to adopt a non-custodial concept of "continuing seizure" in order to take into account under the Fourth Amendment the harms incident to the control exercised by the state over a citizen before trial. She argued that seizures for Fourth Amendment purposes include requiring a person to post bond, compelling a person to appear in court, or imposing restrictions on a person's right to interstate travel, all of which might create reputational, emotional, and financial harms. *Id.* at 278.

Justice Ginsburg's continuing seizure analysis has yet to garner a majority of the justices of the Supreme Court, and we are not compelled to adopt it. The Court has been careful to tie all actions under § 1983 to specifically protected constitutional rights in order to avoid creating a free-standing constitutional tort regime under § 1983. To extend liability in cases without a traditional seizure would expand the notion of seizure beyond recognition and fall into the trap carefully avoided by the *Albright* majority—every charging decision would

-17-

support a § 1983 malicious prosecution-type claim no matter the context.  *See Nieves v. McSweeney*, 241 F.3d 46, 55 (1st Cir. 2001) ("[I]f the concept of a seizure is regarded as elastic enough to encompass standard conditions of pretrial release, virtually every criminal defendant will be deemed to be seized pending the resolution of the charges against him.  That would mean, in turn, that nearly every malicious prosecution claim could be brought before a federal court under the aegis of section 1983.").  While the consequences of unfounded criminal charges are surely grave, the Fourth Amendment adequately covers constitutional interests in the pre-trial exercise of government control over a person or property.  A groundless charging decision may abuse the criminal process, but it does not, in and of itself, violate the Fourth Amendment absent a significant restriction on liberty.

We thus agree with the courts that have also declined to accept Justice Ginsburg's invitation to expand Fourth Amendment liability in cases where the plaintiff has not been arrested or incarcerated.  *See DiBella v. Borough of Beachwood*, 407 F.3d 599, 603 (3d Cir. 2005); *Kingsland v. City of Miami*, 382 F.3d 1220, 1236 (11th Cir. 2004); *Karam v. City of Burbank*, 352 F.3d 1188, 1193 (9th Cir. 2003); *Nieves v. McSweeney*, 241 F.3d 46, 56 (1st Cir. 2001); *Britton v. Maloney*, 196 F.3d 24, 29–30 (1st Cir. 1999) (all declining to recognize typical pre-trial release conditions, such as receiving a summons, posting bond, restricting travel, and appearing in court, as a seizure); *see also Washington v.*

*County of Rockland*, 373 F.3d 310, 317 (2d Cir. 2004) (finding no seizure when plaintiffs charged in administrative proceeding and suspended without pay but never physically detained). These cases, moreover, are consistent with those rejecting a "continuing seizure" rationale for post-arrest incarceration, which hold that even when a defendant is in custody, a seizure ends when pretrial incarceration begins. *See Riley v. Dorton*, 115 F.3d 1159, 1164 (4th Cir. 1997); *Reed v. City of Chicago*, 77 F.3d 1049, 1052 n.3 (7th Cir. 1996) (citing *Wilkins v. May*, 872 F.2d 190, 194 (7th Cir. 1989)).

Even those courts that subscribe to the line of reasoning endorsed by Justice Ginsburg have recognized a seizure only when criminal charges are coupled with another significant restraint on liberty, such as restrictions on travel. *See Evans v. Ball*, 168 F.3d 856, 861 (5th Cir. 1999) ("A summons, coupled with [] additional liberty restrictions [in this case a bond and travel restrictions] may constitute a seizure under the Fourth Amendment."); *Gallo v. City of Philadelphia*, 161 F.3d 217, 222–25 (3d Cir. 1998) (holding plaintiff seized when subjected to travel restrictions and required to contact pretrial services weekly); *Murphy v. Lynn*, 118 F.3d 938, 945 (2d Cir. 1997) (holding plaintiff seized when ordered not to leave state and required to attend court). Becker does not argue that she was subject to any of these indicia of non-physical control arising from MFCU's investigation and prosecution—she apparently never posted bond, was not required to appear in court, and had no specific restrictions on her freedom of

movement. Under these circumstances, even if we were inclined to broaden the meaning of seizure beyond our traditional understanding, this case does not present a vehicle for doing so.

Accordingly, the district court did not err in determining Becker was not seized under the Fourth Amendment.

### b. Seizure of Property

Nor did the defendants unreasonably seize Becker's property in violation of the Fourth Amendment. Becker makes two arguments that the subpoena of her records provides the Fourth Amendment violation necessary to her claim for malicious prosecution under § 1983: (1) the copying of her medical records was an unreasonable seizure because it occurred by means of a subpoena that was not supported by probable cause, and (2) MFCU's various violations of state law collectively add up to a Fourth Amendment violation.

*Probable Cause for the Subpoena*

First, MFCU's issuance of a subpoena to inspect Becker's medical records was not unreasonable under the Fourth Amendment because state administrative subpoenas need not be supported by probable cause. Under Fourth Amendment law, an investigatory or administrative subpoena is not subject to the same probable cause requirements as a search warrant. *See v. City of Seattle*, 387 U.S. 541, 544 (1967); *United States v. Reno*, 522 F.2d 572, 575 (10th Cir. 1975). The Fourth Amendment requires only that a subpoena be "sufficiently limited in

scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome." *City of Seattle*, 387 U.S. at 544; *see also Matter of Grand Jury Subpoena Duces Tecum Issued on June 9, 1982, to "Custodian of Records,"* 697 F.2d 277, 281 (10th Cir. 1983) (holding a subpoena in a criminal investigation "is not unreasonable under the Fourth Amendment if it: (1) commands the production only of things relevant to the investigation; (2) specifies the items with reasonable particularity; and (3) covers only a reasonable period of time"); *United States v. Bailey (In re Subpoena Duces Tecum)*, 228 F.3d 341, 347–49 (4th Cir. 2000) (holding probable cause required for warrants but not subpoenas because warrants are "immedia[te] and intrusive[]" whereas the subpoenaed party has an opportunity to challenge a subpoena before complying with it).

That the subpoena was issued administratively with potential criminal ramifications does not change the analysis. In *United States v. Smith*, 484 F.2d 8, 11 (10th Cir. 1973), we held that an administrative summons issued by the IRS in the initial stages of a tax fraud investigation did not violate the Fourth Amendment when it was issued in good faith and prior to a recommendation for criminal prosecution. More recently, the Sixth Circuit held that an administrative subpoena in a health care fraud investigation by the U.S. Attorney General need not be supported by probable cause. *Doe v. United States (In re Admin. Subpoena)*, 253 F.3d 256, 263–65 (6th Cir. 2001) (applying "reasonable

-21-

relevance" test).  Similarly, grand jury subpoenas need not be supported by probable cause so long as the information sought is relevant and specifically identified.  *Reno*, 522 F.2d at 575.

The subpoena here met these minimal requirements for Fourth Amendment reasonableness, and Becker does not argue otherwise.  Becker's Medicaid filings were flagged by MFCU's analyst, and the records sought were relevant to MFCU's investigation of potential up-coding.  Becker does not argue that the request was unreasonably burdensome or overbroad, and MFCU was able to copy and return the files in a day.  We see no reason to conclude the subpoena was unreasonable under the Fourth Amendment, so the subpoena alone does not provide the basis for a § 1983 claim.

*State Law Violations*

Second, Becker also argues that, even if probable cause was not a necessary predicate to a valid subpoena under the Fourth Amendment, MFCU violated a number of state law provisions in issuing the subpoena for her medical records which collectively amount to an unreasonable Fourth Amendment seizure.  For example, she argues that the subpoena suffered from problems including (1) service by an interested party, (2) failure of MFCU to file a statutorily required return of service with the issuing court, and (3) failure to notify Becker that the records in the court file were sealed.

A state's violation of its own law, however, is not sufficient, in and of itself, to create a federal constitutional violation. *Davis v. Scherer*, 468 U.S. 183, 194–96 (1984); *Rector v. City & County of Denver*, 348 F.3d 935, 947 (10th Cir. 2003). Becker only has a cause of action under § 1983 if the State's actions "fail to meet basic federal constitutional standards," *Rector*, 348 F.3d at 947, and none of the state procedural requirements involving subpoenas rise to that level under the Fourth Amendment. Becker therefore did not suffer an unreasonable seizure of her property.

Because Becker has not successfully alleged a violation of the Fourth Amendment, she cannot proceed in a claim for malicious prosecution based on an unreasonable seizure.

**2. Is There a Malicious Prosecution Claim Based on a Fourteenth Amendment Due Process Violation?**

Even without a Fourth Amendment seizure, Becker argues that MFCU's conduct violated her due process rights because the probe into her billing practices deprived her of liberty or property "without due process of law." She alleges that MFCU's actions violated both the procedural and substantive components of due process.[8] We note at the outset that a natural reading of

---

[8] Procedural due process ensures that individuals are entitled to certain procedural safeguards before a state can deprive them of life, liberty or property. *See Albright*, 510 U.S. at 275 (Scalia, J., concurring). By contrast, the more expansive notion of substantive due process assumes that some deprivations of life, liberty, or property are so grievous that no amount of procedure can justify

(continued...)

Supreme Court precedent in *Albright v. Oliver* seems to foreclose Becker's argument that MFCU violated her due process rights by initiating criminal proceedings against her without probable cause. 510 U.S. 266.

Nevertheless, reading Becker's filings liberally, she alleges some injuries resulting from the filing of criminal charges against her that are outside the scope of the Fourth Amendment's substantive and procedural protections. These injuries might be cognizable as due process violations through a gap in constitutional protection created by *Albright*'s limitation of § 1983 malicious prosecution claims to those based on the Fourth Amendment. We therefore go on to examine Becker's potential due process claims. Even if *Albright* does not foreclose these claims, Becker has not stated a violation of her due process rights.

### a. Effect of Albright on Due Process Malicious Prosecution Claims

In *Albright*, the Court specifically rejected the plaintiff's claim that his groundless arrest violated substantive due process rights by depriving him of a "'liberty interest' to be free from criminal prosecution except upon probable cause." 510 U.S. at 269. Instead, the Court concluded that the Fourth

_____

[8](...continued)
the deprivation. *Parratt v. Taylor*, 451 U.S. 527, 545 (1981) (Blackmun, J., concurring) ("[T]here are certain governmental actions that, even if undertaken with a full panoply of procedural protection, are, in and of themselves, antithetical to fundamental notions of due process."). "Though it is sometimes helpful, as a matter of doctrine, to distinguish between substantive and procedural due process, the two concepts are not mutually exclusive, and their protections often overlap." *Albright*, 510 U.S. at 301 (Stevens, J., dissenting) (citations omitted).

-24-

Amendment—not substantive due process—governed the plaintiff's claims. *Id.* at 270. The plurality opinion reasoned, "Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment . . . must be the guide for analyzing these claims.'" *Id.* at 273 (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)). The plurality concluded, "it is evident that substantive due process may not furnish the constitutional peg on which to hang" a claim of malicious prosecution, 510 U.S. at 270 n.4.[9]

We think the unavoidable construction of *Albright* is that no § 1983 claim will arise from filing criminal charges without probable cause under the substantive due process protections of the Fourteenth Amendment. And although the plaintiff in *Albright* did not raise a *procedural* due process claim, 510 U.S. at 271, we find *Albright*'s reasoning regarding substantive due process equally persuasive with regard to the Fourteenth Amendment's procedural component. In the initial stages of a criminal proceeding, the Fourth Amendment protects a person's liberty interests under the constitution by ensuring that any arrest or

---

[9] In apparent regard for this holding in *Albright*, Becker presents her malicious prosecution claims under a heading separate from her substantive due process claims based on a right to be free from criminal prosecution designed to extort money. We consider that the gravamen of Becker's complaint under both theories is that she was prosecuted without probable cause. Accordingly, we address her substantive due process arguments here under the heading of malicious prosecution but determine that, even if *Albright* does not foreclose her claim, she has not presented a substantive due process violation.

physical incarceration attendant to a criminal prosecution is reasonable. *See, e.g.*
*Albright*, 510 U.S. at 274 ("We have in the past noted the Fourth Amendment's
relevance to the deprivations of liberty that go hand in hand with criminal
prosecutions.") (citing *Gerstien v. Pugh*, 420 U.S. 103, 114 (1975)). The more
general due process considerations of the Fourteenth Amendment are not a
fallback to protect interests more specifically addressed by the Fourth
Amendment in this context. *See Albright*, 510 U.S. at 273 (quoting *Graham v.
Connor*, 490 U.S. 386, 395 (1989)).

Our post-*Albright* cases similarly emphasize the prominence of the Fourth
Amendment in the analysis of pre-trial liberty interests. *See Pierce*, 359 F.3d at
1285 (noting "[t]he initial seizure is governed by the Fourth Amendment" and
finding plaintiff stated a Fourth Amendment claim when he was arrested and
imprisoned); *Taylor*, 82 F.3d at 1560 (noting "the Fourth Amendment govern[s]
pretrial deprivations of liberty" and finding a Fourth Amendment violation when
the plaintiff was arrested) (both citing *Albright*).

Under the facts of this case, where criminal charges were brought but
dismissed before trial, Becker must allege a violation of the Fourth Amendment in
order to proceed on a theory of § 1983 malicious prosecution. The Supreme
Court nonetheless has yet to clarify the scope of the plurality holding in *Albright*.
And several lines of cases suggest an alternative theory of liability under the
Fourteenth Amendment. We turn to those theories next.

**b. Procedural Due Process**

Becker alleges seven separate instances which she claims collectively amount to a violation of her procedural due process rights.[10]  For analytical clarity, we construe her due process claims to be based on the following two potentially protected interests: (1) a liberty interest in being free from unwarranted investigation and prosecution without probable cause, and (2) a property interest in the integrity of her medical and billing records.

We conclude that Becker's procedural due process interests under these facts were adequately protected by the Fourth Amendment, state tort law, and the procedures offered to challenge the administrative subpoena.

*The Investigation and Prosecution*

Becker first argues she had a protected liberty interest in freedom from the baseless investigation into her billing practices and the subsequent filing of criminal charges, when they were not supported by probable cause.  We do not agree she has established an absence of procedural protections sufficient to create a due process violation.

---

[10]  She claims the following are procedural due process violations: (1) the absence of probable cause for the subpoena, (2) lack of notice that her case file had been sealed, (3) service of the subpoena by an interested party, (4) requiring travel to Salt Lake City to challenge the subpoena, (5) failure to make a return of service of the subpoena, (6) subsequently informing Gardner that the records had been obtained voluntarily, and (7) hiding exculpatory information.  Aplt. Br. 32–38.  Becker also argues these circumstances amount to a Fourth Amendment violation.

Several cases suggest that at some point in the prosecutorial process, due process concerns can be sufficient to support a claim under § 1983. *See, e.g., Pierce*, 359 F.3d at 1285–86. In *Pierce*, we recognized that "at some point after arrest, and certainly by the time of trial, constitutional analysis [of a malicious prosecution claim] shifts to the Due Process Clause." 359 F.3d at 1285–86; *see also Castellano v. Fragozo*, 352 F.3d 939, 942 (5th Cir. 2003) (analyzing knowing use of manufactured evidence and perjured testimony at trial as violations of due process sufficient to support a § 1983 malicious prosecution claim); *Riley v. Dorton*, 115 F.3d 1159, 1162 (4th Cir. 1997) (holding that once a suspect is subject to pre-trial detention, due process governs the conditions of ongoing custody).[11] However, we determined in *Pierce*, "It is not necessary in this case to determine where Fourth Amendment analysis ends and due process

_____

[11] The Sixth Circuit, however, after *Albright*, has analyzed malicious prosecution-type claims based on ongoing custody under the Fourth Amendment rather than due process. *Gregory v. City of Louisville*, 444 F.3d 725, 750 (6th Cir. 2006). *Contra Taylor v. Waters*, 81 F.3d 429, 436 (4th Cir. 1996) ("[The Fourth A]mendement requires that arrests be made based upon probable cause . . . . Once such a determination of probable cause has been rendered, however, the Fourth Amendment does not impose any further requirement of judicial oversight or reasonable investigation to render pretrial seizure reasonable. Instead, other constitutional guarantees contained in the Bill of Rights—such as the right to a speedy trial—protect the accused . . . .") (internal citations omitted); *Torres v. McLaughlin*, 163 F.3d 169, 174 (3d Cir. 1998) ("[P]ost-conviction incarceration cannot be a seizure within the meaning of the Fourth Amendment."). *See also Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989) (acknowledging the Court has not "resolved the question whether the Fourth Amendment continues to provide individuals with protection against the deliberate use of excessive physical force beyond the point at which arrest ends and pretrial detention begins").

analysis begins, because Mr. Pierce raised claims under both constitutional provisions, and neither party argues that the difference in standards has any bearing on this appeal." 359 F.3d at 1286. By contrast, the difference in standards does matter to Becker's appeal, because, unlike Mr. Pierce, she was never arrested in violation of the Fourth Amendment.

But even if we assume a procedural due process analysis applies to Becker's case, she has not established a due process violation. First, under *Albright* and our subsequent cases, the Fourth Amendment adequately protected Becker's constitutional liberty interests, and she therefore has no procedural due process claim based on pre-trial deprivations of physical liberty. *See Albright*, 510 U.S. 266; *Pierce*, 359 F.3d at 1285–86; *Taylor*, 82 F.3d at 1560. We are not aware, moreover, of any other circuit that has extended Fourteenth Amendment procedural due process guarantees to pre-trial deprivations of liberty.

Nevertheless, we acknowledge that the Fourteenth Amendment's protections encompass harms to liberty outside the scope of the Fourth Amendment's concern with freedom from restraint, such as harm to reputation resulting in some tangible injury, from which a plaintiff in Becker's circumstances may indeed suffer. *See, e.g., Michael H. v. Gerald D.*, 491 U.S. 110, 121 (1989); *Paul v. Davis*, 424 U.S. 693, 701 (1976); *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971). But even if Becker did suffer such injuries other than physical restraint, procedural due process only protects against

them by providing an adequate post-deprivation hearing in which the injured party may vindicate these interests. *See Constantineau*, 400 U.S. at 436–37.

In this case, state tort remedies meet the procedural requirements of the Due Process Clause. The Supreme Court has held that where pre-deprivation remedies cannot anticipate and prevent a state actor's wrongful act, post-deprivation state tort remedies are adequate to satisfy due process requirements. *Parratt v. Taylor*, 451 U.S. 527, 535–44 (1981) (holding state could not anticipate employee's negligence); *see also Hudson v. Palmer*, 468 U.S. 517, 533 (1984) (extending *Parratt's* logic to intentional torts). In his *Albright* concurrence, Justice Kennedy argued that in § 1983 malicious prosecution cases, a "state actor's random and unauthorized deprivation of [Fourteenth Amendment due process interests] cannot be challenged under 42 U.S.C. § 1983 so long as the State provides an adequate post deprivation remedy." 510 U.S. at 284 (Kennedy, J., concurring). As he explained, "In the ordinary case where an injury has been caused . . . by a random and unauthorized act that can be remedied by state law, there is no basis for intervention under § 1983, at least in a suit based on 'the Due Process Clause of the Fourteenth Amendment.'" *Id.* at 285 (quoting *Parratt*, 451 U.S. at 536); *see also Nieves*, 241 F.3d at 53 (rejecting procedural due process claim under § 1983 for malicious prosecution because state provides adequate tort remedy); *Newsome v. McCabe*, 256 F.3d 747, 751 (7th Cir. 2001) (holding state

tort remedy "knocks out any constitutional tort of malicious prosecution" based on due process). We agree with this analysis.

Becker does not suggest what pre-deprivation process could have anticipated the malfeasance of the MFCU investigators and protected her from an abusive investigation, and we decline to supply procedural requirements in addition to already-established criminal procedure under the Constitution and state law. Utah tort law provides an adequate post deprivation remedy to protect Becker's non-Fourth Amendment liberty interests. *See Gilbert v. Ince*, 981 P.2d 841 (Utah 1999) (recognizing state causes of action for malicious prosecution and abuse of process); *see generally* 2 Dan B. Dobbs, *The Law of Torts* § 438 (2001) (describing damages for malicious prosecution or abuse of process). Accordingly, in this case, where Becker was never seized in violation of the Fourth Amendment, Utah tort law provides an adequate procedural due process remedy for any injuries not cognizable as a Fourth Amendment seizure.

Becker has therefore suffered no deprivation of liberty in violation of her procedural due process rights.

*The Medical Records*

Nor does the subpoena of her medical records create a separate cause of action under Fourteenth Amendment procedural due process. First, Becker's participation in the state and federal Medicaid program established a continuing obligation to make records available to state officials. MFCU was entitled to the

-31-

records, which it copied and returned the same day. Accordingly, any property interest Becker had in the records was minimal.

Second, "[u]nder the Fourteenth Amendment, procedural due process requires notice and a pre-deprivation hearing before property interests are negatively affected by governmental actors." *Marcus v. McCollum*, 394 F.3d 813, 818 (10th Cir. 2004). The subpoena in this case complied with those requirements by offering Becker the opportunity for a pre-deprivation hearing. The district court found that "it is undisputed that plaintiff read the subpoena and understood that she could either produce the records immediately or appear in Salt Lake City a few days later." *Becker v. Kroll*, 340 F. Supp. 2d 1230, 1241 (D. Utah 2004). And of course Becker could have challenged the subpoena in court. *See In re Subpoena Duces Tecum*, 228 F.3d at 348 ("[T]he issuance of a subpoena initiates an adversary process that can command the production of documents and things only after judicial process is afforded."). This opportunity to be heard is all procedural due process requires. *See Stanko v. Mahar*, 419 F.3d 1107, 1115 (10th Cir. 2005) (due process requires "*opportunity* to be heard at a meaningful time and in a meaningful manner") (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)) (emphasis added); *Boddie v. Connecticut*, 401 U.S. 371, 378–79 (1971) (holding that "the hearing required by due process is subject to waiver"); *Miller v. Campbell County*, 945 F.2d 348, 354 (10th Cir. 1991) (finding no

procedural due process violation when plaintiffs were offered but did not use opportunity for hearing).

Admittedly, the opportunity for a hearing offered was inconvenient, requiring a 300-mile trip to Salt Lake City. Nevertheless, that Becker chose to comply with the subpoena rather than avail herself of the process provided does not amount to a violation of any procedural due process rights.

The district court did not err in dismissing Becker's procedural due process claims.

### c. Substantive Due Process

Justice Souter's concurrence in *Albright* suggested the possibility that initiating an unwarranted prosecution that is dismissed before trial may in some unusual circumstances result in substantive due process violations separate from a Fourth Amendment seizure: "There may indeed be exceptional cases where some quantum of harm occurs in the interim period after groundless criminal charges are filed but before any Fourth Amendment seizure. Whether any such unusual case may reveal a substantial deprivation of liberty . . . independent of the Fourth Amendment, are issues to be faced only when they arise." *Albright*, 510 U.S. at 291 (Souter, J. concurring); *see also Darrah v. City of Oak Park*, 255 F.3d 301, 309 (6th Cir. 2001) (noting "§ 1983 malicious prosecution claims may still be available pursuant to the Fourteenth Amendment's substantive due process rights" in cases that do not involve a Fourth Amendment seizure); *Torres v. McLaughlin*,

-33-

163 F.3d 169, 173 (3d Cir. 1998) (concluding *Albright* forecloses substantive due process analysis only if the claim "is covered by the Fourth Amendment").

Becker argues that MFCU officials violated her substantive rights under the Fourteenth Amendment's due process clause when they engaged in a groundless investigation designed to obtain civil penalties from her and withheld material evidence tending to exonerate her. We conclude this is not a case that reveals a substantial deprivation sufficient to rise to the level of a substantive due process violation.

### *Claims Arising From the Investigation*

Our cases recognize a § 1983 claim for a violation of Fourteenth Amendment substantive due process rights in the narrowest of circumstances. The conduct alleged "must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power . . . [It] must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." *Livsey v. Salt Lake County*, 275 F.3d 952, 957–58 (10th Cir. 2001); *Uhlrig v. Harder*, 64 F.3d 567, 573 (10th Cir. 1995). This standard is met in only the most extreme circumstances, typically involving some violation of physical liberty or personal physical integrity. *See, e.g., Holland v. Harrington,* 268 F.3d 1179 (10th Cir. 2001) (finding substantive due process violation when police held children at gunpoint for extensive period of time even after control of home had been

secured); *Dubbs v. Head Start, Inc.*, 336 F.3d 1194 (10th Cir. 2003) (recognizing potential parental claim for substantive due process violation where government did not seek consent before performing blood tests and genital exams on minor children).

The Supreme Court sets a similarly high hurdle for substantive due process claims. It "has always been reluctant to expand the concept of substantive due process because the guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins v. Harker Heights*, 503 U.S. 115, 125 (1992). "The protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity." *Albright*, 510 U.S. at 272 (citing *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 847–49 (1992)).

The conduct alleged here does not meet this rigorous standard. While the enforcement tactics and absence of professionalism in this case—if true as alleged—fail the most obvious standards of proper conduct, they do not meet the affronts to personal autonomy suggested by our case law. Becker has a number of well-defined causes of action under state and federal law to vindicate her interests. To rest her claims on the undefined contours of substantive due process

would only introduce uncertainty and analytical confusion to an already unwieldy body of law.[12]

*Claims Arising From the Withholding of Evidence*

Becker also claims MFCU violated her due process rights by withholding exculpatory evidence. Several other circuits have recognized a § 1983 malicious prosecution-type claim under similar circumstances. *See Moran v. Clarke*, 296 F.3d 638, 647 (8th Cir. 2002). The Eighth Circuit in *Moran* concluded that *Albright* did not foreclose a substantive due process claim because "[a]lthough the Fourth Amendment covers seizures, which would be satisfied by Moran's arrest, law enforcement's intentional creation of damaging facts would not fall within its ambit. Here, we see no specifically applicable constitutional remedy that provides Moran with explicit protection to a level sufficient to exclude substantive due process analysis." *Id.*[13]

_____

[12] Even if we agreed that Becker has stated a substantive due process claim, given the novel nature of Becker's theory when compared with earlier cases, qualified immunity would likely apply to the officials involved. *See Holland*, 268 F.3d at 1186.

[13] After the *Moran* case was remanded to the trial court and appealed again, the court hearing the second appeal apparently rejected *Albright*'s language limiting § 1983 malicious prosecution to claims based on the Fourth Amendment because the challenged conduct was "well beyond the realm of malicious prosecution" in light of the "purposeful conspiracy" involved. *Moran v. Clarke*, 359 F.3d 1058, 1061 (8th Cir. 2004). To this extent, *Moran* seems to base its holding, which otherwise seems clearly contrary to *Albright*, in the substantive due process protections against outrageous and arbitrary government conduct Justice Souter alluded to in his *Albright* concurrence. 510 U.S. at 291 (Souter, J.

(continued...)

-36-

Becker presents a similar claim: that the defendants violated her due process rights, as distinguished from her Fourth Amendment rights, by suppressing exculpatory evidence and denying her a fair hearing. And this claim has constitutional weight: the Supreme Court in *Brady v. Maryland*, 373 U.S. 83, 87 (1963) determined that a defendant's right to access exculpatory evidence is secured by the Due Process Clause.

Other courts allowing this type of claim despite *Albright* have specifically rooted the constitutional violation in the due process right to a fair trial. *See Castellano*, 352 F.3d at 942, 959 (reasoning that presenting perjury and manufactured evidence at trial violated substantive due process rights, and *Albright* did not apply because events at trial are outside the Fourth Amendment's scope); *Newsome*, 256 F.3d at 752 (holding the plaintiff had "a due process claim in the original sense of that phrase—he did not receive a fair trial if the prosecutors withheld material exculpatory details"); *Jean v. Collins*, 107 F.3d 1111, 1114–15 (4th Cir. 1997) ("*Albright* does not preclude [this] cause of action because the right to disclosure of exculpatory evidence is grounded directly in the Due Process Clause itself [rather than the Fourth Amendment].").

---

[13](...continued) concurring). Alternatively, *Albright* potentially did not apply in *Moran* because the constitutional violation alleged was a violation of the right to a fair trial, even though the Eighth Circuit did not make this reasoning explicit.

Nevertheless, Becker never proceeded to trial, and she cannot therefore rest her § 1983 claims on a *Brady* violation. *See Brady*, 373 U.S. at 86–88 (framing the right to exculpatory evidence only in terms of providing a fair trial); *see also Jean v. Collins*, 221 F.3d 656, 663 (4th Cir. 2000) (en banc) ("A *Brady* violation that resulted in the overturning of the § 1983 plaintiff's conviction is a necessary, but not a sufficient, condition for § 1983 liability on the part of the police. It is a necessary condition because the *Brady* violation establishes the requisite threshold of constitutional injury (a conviction resulting in loss of liberty) below which no § 1983 action can lie."). We have held that, to establish a *Brady* violation, the defendant must prove "(1) the prosecution suppressed evidence; (2) the evidence was favorable to the accused; and (3) the evidence was material to the defense." *United States v. Geames*, 427 F.3d 1333, 1337 (10th Cir. 2005). A plaintiff cannot establish materiality unless the case goes to trial and the suppression of exculpatory evidence affects the outcome. *See United States v. Bagley*, 473 U.S. 667, 678 (1985) ("[A] constitutional error occurs . . . only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial."). Thus, Becker suffered no due process violation based on *Brady* and the suppression of evidence. *See id.* ("[S]uppression of evidence amounts to a constitutional violation only if it deprives the defendant of a fair trial."); *Taylor v. Waters*, 81 F.3d 429, 436 n.5 (4th Cir. 1996) (allowing no §

1983 claim based on withholding exculpatory evidence where plaintiff did not go to trial).

Accordingly, we agree with the district court that Becker has not established a claim for a violation of substantive due process under the Fourteenth Amendment.

* * *

In sum, the district court did not err in dismissing Becker's malicious prosecution claims based on the Fourth and Fourteenth Amendments. Because we determine that Becker's Fourth and Fourteenth Amendment claims were properly dismissed by the district court, it follows that her claim of conspiracy by the various defendants to commit these constitutional violations also fails.

**B. Retaliation Claim Under the First Amendment**

Becker also asserts a § 1983 claim for retaliatory prosecution under the First Amendment. She contends that Gardner filed criminal charges against her as a result of her public denunciations of MFCU. She points to the fact that just hours after her husband testified before a state legislative committee regarding MFCU's investigative practices, MFCU filed its criminal case. We agree with the district court that Gardner is absolutely immune from suit for the decision to file charges, but we remand for further consideration of Becker's retaliation claim against other defendants.

A prosecutor's charging decisions are absolutely immune from civil suit for monetary damages. *Hartman v. Moore*, 126 S. Ct. 1695, 1704–05 (2006) (citing *Imbler v. Pachtman*, 424 U.S. 409, 431 (1976)); *see also Mink v. Suthers*, 482 F.3d 1244, 1258–59 (10th Cir. 2007). Immunity extends to those activities "intimately associated with the judicial phase of the criminal process," which undoubtedly includes initiating criminal proceedings. *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976). This immunity applies even if the prosecutor files charges knowing he lacks probable cause. *See id.* at 431 n.34 (applying immunity even when prosecutor deliberately withholds exculpatory information from the court). Accordingly, Becker cannot proceed on a retaliation claim based on Gardner's decision to charge her criminally.

The doctrine of absolute immunity, however, is not without limits. Prosecutors and other government officials are not entitled to immunity for administrative and investigative actions that may have influenced the decision to file criminal charges. *See Hartman*, 126 S. Ct. at 1704–05 & n.8 (noting a defendant may proceed in a retaliatory prosecution action against an official "who may have influenced the prosecutorial decision but did not himself make it, and the cause of action will not be strictly for retaliatory prosecution, but for successful retaliatory inducement to prosecute").[14]

---

[14] We have also recognized in the context of malicious prosecution a cause of action against a person who influences the decision to prosecute but does not

(continued...)

To establish a § 1983 retaliation claim against non-immune officials, Becker must plead and prove (1) that she was engaged in a constitutionally protected activity; (2) that a defendant's action caused her to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that a defendant's action was substantially motivated as a response to her exercise of her First Amendment speech rights. *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000). She also must plead and prove the absence of probable cause for the prosecution. *Hartman*, 126 S. Ct. at 1707.[15]

We believe the record on appeal presents a possible inference of retaliatory action. To survive summary judgment on the retaliation claim, Becker must present a genuine issue of material fact as to whether a non-immune defendant influenced the decision to prosecute in retaliation for protected speech. Viewing the facts in the light most favorable to Becker, we can infer the following from the record: (1) in November and December of 1999, Becker began speaking out about MFCU by filing a Notice of Claim against the state and writing to state lawmakers; (2) Becker's speech was part of a larger political debate around the same time that resulted in management changes at MFCU: in December 1999,

---

[14](...continued)
initiate criminal proceedings. *Pierce*, 359 F.3d at 1292.

[15] The Supreme Court issued *Hartman* after briefing took place in this case, so neither the parties nor the district court had the opportunity to directly address the absence of probable cause in the retaliatory prosecution context either in proceedings below or before this court.

Gardner became the MFCU lead prosecutor and sometime thereafter, the state legislature transferred oversight of MFCU from the Department of Public Safety to the Attorney General's office; (3) some defendants stated at their depositions that they were aware of the public criticism and at some point were aware of Becker's planned litigation against the state; (4) while Gardner was reviewing Becker's case, he discussed the investigation with some defendants; (5) these defendants may have withheld information about the investigation from Gardner; (6) as a result, Gardner did not have complete information about the Becker investigation before he made the decision to file charges; and (7) if Gardner had complete information, he would not have filed criminal charges in January 2000.

If Becker has established a genuine issue of material fact as to the points above against defendants not entitled to immunity, her retaliation claim may be able to proceed to a jury. *See, e.g., Meyer v. Bd. of County Comm'rs of Harper County*, 482 F.3d 1232, 1244 (10th Cir. 2007) ("The crucial point, of course, is that it is for the jury to decide what inference to draw."); *Piercy v. Maketa*, 480 F.3d 1192, 1198 (10th Cir. 2007). The district court's summary judgment order did not discuss Becker's theory of retaliation by non-immune defendants who may have induced the prosecution by withholding key evidence from Gardner.[16]

---

[16] In the second order granting summary judgement to Kroll and Wright on malicious prosecution, the district court noted that "Dr. Becker has created factual disputes as to whether defendants Kroll and Wright deliberately supplied misleading information that resulted in Dr. Becker being charged and prosecuted.

(continued...)

Neither did it address the role particular defendants played in influencing Gardner's decision.

We therefore remand the retaliation claim to the district court for further consideration on summary judgment.

## C.  State Libel Claim

Finally, in a pendent state law claim Becker argues that Gardner and Evans committed libel by publishing untrue statements about her case on the MFCU website, which was available to the public.  We conclude that Becker has established sufficient evidence for a jury to consider her libel claim.

In brief, the MFCU website detailed MFCU activities, including cases, dispositions, and general news.  Becker's case was reported under a category called "Fraud Cases-Dismissals," on January 12, 2001, well after MFCU had dismissed all of its charges against her.  The MFCU report included the following passage:

> ***Taj Becker, M.D.***  This neurologist was charged with one Second Degree Felony count of False Claims for Medical Benefits.  The case stemmed from Utah MFCU investigation which uncovered widespread [] upcoding.  Patient records obtained from the doctor's office failed to substantiate corresponding services had been provided to justify the upcoded bills submitted to Medicaid.  Fraud estimate approximated $17,000.  Following the Preliminary Hearing (PH) in this case, the defendant was bound over for trial as charged,

[16](...continued)
The same holds true with respect to whether Mr. Kroll and Mr. Wright suppressed exculpatory evidence that resulted in Dr. Becker's continuing prosecution."  Aplt. App. 46.  But it never applied these findings to Becker's retaliation claims.

but significant problems were disclosed during the PH, including key meetings with the defendant which had not been documented, and referral of the case to a neurologist expert, also not documented. *Because of political pressure which had been brought on the MFCU as a result of this case and several others involving rural doctors, the case was dismissed with prejudice, and referred to the Utah Department of Health for civil or administrative recovery of the overpaid Medicaid funds.*

Aplt. App. 161 (emphasis added).

Becker alleges that this published statement about her case is libelous under Utah state law. To state a claim for defamation in Utah, a plaintiff must show "[1] that defendants published the statements concerning him [either in print or by spoken words], [2] that the statements were false, defamatory, and not subject to any privilege, [3] that the statements were published with the requisite degree of fault, and [4] that their publication resulted in damage." *West v. Thomson Newspapers*, 872 P.2d 999, 1007–08 (Utah 1994); *see also Wayment v. Clear Channel Broad., Inc.*, 116 P.3d 271, 278 (Utah 2005) (applying these elements). In addition, libel claims against state officials must show that the defendants "acted or failed to act through fraud or malice" in order to waive sovereign immunity. Utah Code Ann. § 63-30-4(3)(b)(I).[17]

Under Utah law, the libel plaintiff must prove "malice" to establish the requisite degree of fault for the third element of *Thomson Newspapers*. The

_____

[17] Section 63-30-4 was repealed in July 2004. It has been replaced by Utah Code Ann. § 63-30d-202. The differences between the two statutes are minor. Because § 63-30-4 was the law in effect at the time of the alleged libel, we refer to it.

district court dismissed Becker's libel claim because she "failed to produce evidence sufficient to support a finding of fraud or malice in the publication [by Gardner or Evans] of the report on the Internet."[18] *Becker v. Kroll*, 340 F. Supp. 2d at 1239. The district court defined malice as requiring a showing of "ill will or spite," citing *Murphree v. US Bank of Utah*, 282 F. Supp. 2d 1294, 1297 (D. Utah 2003). The Utah Supreme Court has provided a more expansive definition:

> Under the common law standard of malice, to overcome a conditional privilege [such as that provided by the Utah Governmental Immunity Act], a plaintiff must show 'an improper motive such as a desire to do harm or that the defendant did not honestly believe his statements to be true or that the publication was excessive.'

*Russell v. Thomson Newspapers*, 842 P.2d 896, 904 (Utah 1992) (quoting *Seegmiller v. KSL, Inc.*, 626 P.2d 968, 975 (Utah 1981)). In our view, Becker has shown sufficient evidence of malice to survive summary judgment.

The record supports an inference of malice under the *Thomson Newspapers* standard. At the time MFCU dropped its case against Becker in September 2000, Gardner had determined that evidence of Becker's innocence had possibly been withheld from him. By the time the case summary was published in January 2001, moreover, both civil and criminal claims had been dismissed for over five

---

[18] Becker also argues she is entitled to the "fraud" exception in § 63-30-4(3)(b)(I). She has never articulated, however, how she meets the elements of a fraud claim against Gardner and Evans. *See Gold Standard, Inc. v. Getty Oil Co.*, 915 P.2d 1060, 1066–67 (Utah 1996) (laying out nine essential elements to prove fraud). Thus, the district court properly held that a fraud theory to support the libel claim was not pleaded with the requisite particularity under Fed. R. Civ. P. 9(b).

months. Gardner and Evans thus had concluded well before the publication on the website that the charges were unprosecutable, among other things, due to problems associated with the subpoena, missing notes of alleged meetings, and the failure to disclose material exculpatory evidence. And Becker later prevailed in an administrative hearing on the billing allegations.

Despite these facts, the Internet publication uses loaded jargon such as "political pressure" to imply that Becker was guilty as charged, and that dismissal was not based on the merits of the charges. To compound the implication, the publication tells the reader that Becker's case had been referred to another state agency for collection of "overpaid Medicaid funds," a clear statement that Becker had committed fraud against the state and was let off the hook for other reasons.

While Gardner argues he subjectively believed Becker was a law-breaker at the time of the report's publication, a reasonable jury could conclude that both Gardner and Evans could not have reasonably believed the statements were true. The defendants will be able to provide evidence of their subjective belief at trial, but at the stage of summary judgment, enough evidence of malice exists to merit consideration by the jury.

Gardner and Evans also argue that their involvement in the case summary is immune under Utah law. Under Utah's libel law, a report required by state or federal law is immune from suits for libel or slander if made "in the proper discharge of an official duty" or "by a fair and true report, without malice, of a

judicial, legislative or other public official proceeding." Utah Code Ann. § 45-2-3(1) and (4). Evans and Gardner claim the privilege from suit because the MFCU annual report is a publication required by the federal government as part of Utah's participation in the Medicaid program. While the statute will provide an immunity from suit for "fair and true" reports, it expressly provides the same state-of-mind exception as the governmental immunity statute—malice.

In sum, the district court erred in dismissing Becker's state law libel claim against Gardner and Evans for failure to present evidence of malice.

## IV. Conclusion

For the foregoing reasons, we AFFIRM the district court's dismissal of Becker's Fourth and Fourteenth Amendment claims under 42 U.S.C. § 1983 and REVERSE the court's dismissal of Becker's First Amendment retaliation and related conspiracy claims. We also REVERSE the dismissal of the state law libel claim against defendants/appellees Gardner and Evans. We therefore REMAND the retaliation and conspiracy claims and the state law claim to the district court for further proceedings consistent with this opinion.[19]

---

[19] We DENY Becker's Motion for Permission to Supplement the Record dated November 10, 2005.